## Mays' Estate.

Argued April 16, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Samuel N. Mogilowitz,* of *Skelly & Mogilowitz,* with him *G. G. Martin,* for appellants.

*Donald Glenn,* for appellee.

OPINION BY RHODES, J., October 2, 1940:

Edward W. Mays, a resident of Rockland Township, Venango County, Pa., died intestate on September 4, 1936, at the age of 80 years. In the application for letters of administration upon his estate it was stated that he was unmarried. In the course of administration of his estate his administrator was notified of the existence of an alleged son, George J. Mays, the appellee herein, and therefore moved in the Orphans' Court of Venango County for the appointment of an auditor to make distribution of the funds of the estate. The auditor in his report found as a fact that George J. Mays was the legitimate child of the decedent and Mary Gormley Mays, and made conclusions of law that he was the decedent's sole heir at law and entitled to the entire estate. The collateral relatives of the decedent filed exceptions to the report, which were dismissed by the orphans' court, and the auditor's report was confirmed absolutely. They have appealed, and assign as error the dismissal in the court below of their

exceptions not only to the finding and conclusions above referred to, but also to the finding that Mary Gormley and decedent were husband and wife and the conclusion of law that she was his lawful wife.

The evidence presented before the auditor can be summarized as follows: The decedent had two brothers; Henry, who predeceased him, and Horatio, who survived him. He had five sisters, of whom two survived him. These surviving sisters and brother all testified before the auditor to the effect that to their knowledge the decedent had never married. They testified also that, with the exception of part of the year 1890, he had lived all his life with his own parents or had made a common home with his unmarried sister and either of his brothers in Rockland or Franklin, Pa. S. B. Babcock, Esq., a member of the Bar of Venango County, attorney for the administrator, who, during the last eight years of decedent's life, had been guardian of his estate, testified that he had never heard of the existence of any reputed child of decedent until after his death.

It was, however, admitted by appellants that during 1890 the decedent and his brothers left Rockland and worked at the drilling of oil wells in the vicinity of Murrinsville, Butler County, Pa., and that there they boarded at the farm homestead of Neil or Cornelius Gormley. Two of the daughters and two of the sons of Gormley appeared before the auditor. They variously testified that their deceased sister Mary had met the decedent at their home in 1890, in the summer of 1891 had told her sister she was planning to marry him, left home alone in August, 1891, and returned in the spring of 1892 with decedent and a baby a few weeks old, the present appellee; that in answer to her father's inquiry the couple declared they were married and the child was their son; that they remained at the farm until fall, occupying the same room, and addressed each

other as husband and wife; that he referred to the baby as his; that the decedent's brother, Horatio, visited at the farm and saw his brother, the mother, and child that summer; that Mary Gormley told her sister they had been married at Lawrenceville, Pa., and the child born on Butler Street in Pittsburgh near the end of April, 1892; that the couple and the child left the farm that fall to go to Sharpsburg, Pa., or Pittsburgh, but lived thereafter at Sharpsburg and Etna, Pa., where one of the witnesses visited them, and they had a second son who died in infancy and was buried at Parker; that the mother and child moved to Pittsburgh without the decedent, and lived apart from him thereafter; and that the mother claimed the name Mays until her death. The baptismal record of St. Mary's Church, Sharpsburg, Pa., was offered on behalf of appellee and was received, evidencing the baptism on July 18, 1893, of a child George, born October 5, 1892, at Etna to Edward "Mayes" of "Rockide," Pa., and "Maria Gormily" of "Marrinsville, Pa."

On this evidence the auditor made the findings of fact and conclusions of law above referred to, and also a conclusion of law that the decedent and Mary Gormley had not contracted a common-law marriage, so that his determination that the appellee was the decedent's legitimate son depends exclusively on the sufficiency in law of the evidence (1) of the decedent's paternity, and (2) of a ceremonial marriage between decedent and appellee's mother.

It is true, as appellants point out, and as the Supreme Court said in *Hirst's Estate*, 274 Pa. 286, 117 A. 682, that claims against a dead man's estate, which might have been made against him while living, are always subjects of just suspicion, and are faced with the necessity of strict requirement of proof. It may also be conceded that one who seeks to establish re-

lationship to a person already dead has a heavy burden of proof.

In the instant case appellee had the burden of proof of his *relationship* to the decedent, that is, the decedent's paternity, apart, primarily, from any question of his own legitimacy. This is made clear by *Pickens' Estate*, 163 Pa. 14, 29 A. 875. That case arose on exceptions to an auditor's report on distribution of the estate of a decedent whose mother, previous to marriage with his father, had lived with another man by whom she had a son who became the father of the claimant. The Supreme Court said (p. 20): "In this case the burden of proof, to establish his relationship to the decedent was upon the appellant, but he was not confronted with the presumption of the illegitimacy of his ancestor, and not required to disprove it. In the absence of all evidence the presumption was the other way, and after this lapse of time could not have been removed except by clear proof." Appellee had the burden of proving himself the son, whether or not legitimate, of Edward W. Mays, the decedent. But in our opinion, after a careful review of the record, it cannot be said that the appellee did not sustain this burden. There was evidence which, if believed, showed the decedent frequently to have acknowledged the child as his own over a period of months while living in the parental home of the child's mother. The baptismal record offered in evidence bore what appeared to be the names of the decedent and appellee's mother as his parents, together with what appeared to be the names of their respective birthplaces, Rockland and Murrinsville. The testimony of at least one of the witnesses, appellee's aunt, Mrs. Martha E. Kelly, places the residence of his mother and the decedent at Sharpsburg, Pa., where this baptismal record was found, at or near the time it indicates the baptism to have been administered. Undoubtedly there are discrepancies in

the proof, for example, the date of birth stated in the baptismal certificate, as compared with the other testimony of appellee's witnesses, but the credibility and weight of the evidence are not for us to determine. The authorities are to the effect that where a claim is presented against a decedent's estate, the weight to be given the evidence is for the auditing judge, whose findings, based on consideration of the questions presented and not upon a capricious disbelief, will not be disturbed by the appellate court. *Swoope's Estate,* 317 Pa. 584, 586, 177 A. 748; *Sailer's Appeal,* 120 Pa. Superior Ct. 69, 72, 181 A. 854.

Appellee's kinship to decedent having thus been shown, it was not incumbent upon him to go further to prove his legitimacy; it was for the appellants to disprove it, and that by proof that was clear, direct, satisfactory, and irrefragable (*Pickens' Estate,* supra; *McAnany's Estate,* 91 Pa. Superior Ct. 317). In *McAnany's Estate,* supra, this court, speaking through Judge CUNNINGHAM, said (p. 321) : "The presumption and charity of the law are in favor of the legitimacy of every child and whoever seeks to bastardize it must establish its illegitimacy by proof that is clear, direct, satisfactory and irrefragable." The issue there was whether the claimant's father, Patrick, was the legitimate half-brother of the decedent, Edward. His birth in Ireland 80 years previous and the identity of his mother alike were shrouded in mystery, but there was clear documentary evidence that he was the acknowledged child of John, the decedent's father. The auditing judge found him legitimate, and this court affirmed the lower court's dismissal of the exceptions to the finding, saying, in part (p. 322) : "The learned and able counsel for appellant seek to distinguish this case by pointing out that there was evidence in the Pickens case that the mother had lived with Obenstein previous to her marriage to Pickens, but that there is no evi-

dence that John McAnany ever lived with Patrick McAnany's mother. This is true, but it is equally true that there is no evidence that he did not live with Patrick's mother previous to his marriage to Elizabeth Murphy. The presumption is as strong one way as the other and that 'in favor of innocence and legitimacy' should prevail until overcome by the proper measure of proof."

In *Pickens' Estate,* supra, the claimant and decedent had a common ancestor who was thus described by the Supreme Court (p. 20) : "There was no distinct evidence of a marriage to either, but presumably she was the lawful wife of each. Such a presumption is entirely consistent with the facts as established by the testimony, but if conflicting presumptions arose that in favor of innocence and legitimacy would prevail."

In *Wile's Estate,* 6 Pa. Superior Ct. 435, we find a case which arose on a claim on behalf of a child under the will of its paternal grandfather. Its mother married its father in due form in 1884, and lived with him until his death in 1891. Previously, in 1866, she had been married to one Andrews who deserted her in 1872, and was not heard from until after the birth of this child, when he reappeared. Two or three years after the desertion he married another woman, with whom he thereafter lived and cohabited, having made declarations that his first marriage was void. The auditing judge held the child illegitimate; the court in banc sustained exceptions. On appeal the decree of the court below was affirmed, and it was held that the child was entitled to a presumption of legitimacy, and that the burden of showing the first marriage not dissolved was on appellants. In speaking of the burden of proof upon those denying legitimacy, this court, through President Judge RICE, in that case said (p. 443) : "In answer to the question, how were they to prove that he was not divorced, it may be asked how was this appellee to

prove that he was? If he must prove it by the record it would be scarcely less difficult for him to ascertain the state and the court in which the decree was made, than for the appellants to prove the negative; and, it is to be borne in mind that even where guilt can be established only by proving a negative, the negative must in most cases be proved by the party alleging the guilt, unless the fact be one peculiarly within the knowledge of the other party."

It thereby appears that the presumption of legitimacy is in reality the presumption of the fact and of the validity of the marriage of the child's parents, once parentage is established. This view is also supported by the language used in *Wharton's Estate*, 218 Pa. 296, 67 A. 414.

The learned counsel for appellants argues that the effect of the lower court's opinion is to presume a marriage from a presumption of legitimacy instead of presuming legitimacy from proof of marriage, and that a presumption can never be based upon a presumption. This is inaccurate, since the presumption of legitimacy and of marriage of the parents is here one and the same. Therefore, there is no presumption on presumption.

The nature of this presumption is well expressed in *Wile's Estate*, supra, as follows (p. 444) : "Of necessity, resort must often be had to presumptive evidence, and it is not too much to say that the burden of proof is often placed, and shifted, not only because of the convenience of proving or disproving a fact in issue, but also upon grounds of public policy. 'Society rests upon marriage, the law favors it, and when a man and woman have contracted marriage in due form, the law will require clear proof to remove the presumption that the contract is legal and valid.' "

The function of a presumption is also accurately characterized in *Neely et al. v. Provident Life & Accident Insurance Co.*, 322 Pa. 417, at page 425, 185 A.

784, at page 788, as follows: "As we pointed out in *Watkins v. Prudential Ins. Co.* (supra) [315 Pa. 497, 173 A. 644], there is 'a welter of loose language concerning presumptions.' We there attempted to make plain the distinction between a presumption and an inference. We said: 'Presumptions are not evidence and should not be substituted for evidence ...... Presumptions are not fact suppliers; they are guide posts indicating whence proof must come.' We quoted from Professor Thayer in his Storrs Lectures in 1896, as follows: 'A presumption itself contributes no evidence and has no probative quality. It is an instrument of proof in the sense that it determines from whom evidence shall come ...... The moment these conceptions give way to the perfectly distinct notion of evidence proper—i. e., probative matter, which may be a basis of inference, something capable of being weighed in the scales of reason and compared and estimated with other matter of the probative sort—so that we get to treating the presumption of innocence or any other presumption, as being evidence in this its true sense, then we have wandered into the region of shadows and phantoms.' "

The effect of the presumption of the present appellee's legitimacy was, therefore, to place upon appellants the burden of disproof of the marriage of his mother and the decedent. This burden they might have met in such a conclusive manner as to require appellee to rebut proof of his illegitimacy by any means at his command. This will, upon examination, be found to be the situation in which falls every case cited by appellees having to do with legitimacy of children rather than marriage merely. In *Craig's Estate,* 273 Pa. 530, 117 A. 221, *Wharton's Estate,* supra, and *Balanti v. Stineman Coal & Coke Co. et al.,* 131 Pa. Superior Ct. 344, 200 A. 236, the presumption of legitimacy was rebutted by evi-

dence that the parents were not actually married, either at common law or by ceremony.

Whatever language may have been used in those opinions holding the child to proof of his own legitimacy must be understood as referring to his duty to meet direct evidence brought forward against the presumption of his legitimacy to show his parents in fact unmarried.

Appellants cite *Fuller's Estate,* 250 Pa. 78, 95 A. 382, and *Bisbing's Estate,* 74 Pa. Superior Ct. 317, in support of their contention that there was no presumption that appellee was the legitimate son of decedent in the absence of proof of marriage between his mother and decedent. An examination of those cases discloses that they lend no support to appellants' position. In *Fuller's Estate,* supra, the evidence indisputably showed the relationship between the decedent and the mother of the children to have been illicit at its commencement, and on the presumption that it so continued it was held their duty to prove a marriage. In *Bisbing's Estate,* supra, the mother of the child admitted her relations with the decedent were illicit, and that she had declined his proposal to marry. This court affirmed the lower court's rejection of the child's claim to a distributive share in its father's estate, adopting the holding of the Supreme Court in *Bisbing's Estate,* 266 Pa. 529, 109 A. 670, that the mother's claim was likewise baseless. In so holding, the Supreme Court there said that cohabitation and reputation supply a presumption, but that this disappears in the face of proof of no actual marriage.

Whether, in the instant case, that stage was reached where appellee was obliged to go on with evidence of his legitimacy would appear to depend upon the evidence adduced by appellants in disproof of the presumed marriage of appellee's mother and decedent. This consisted of the decedent's reputation among them as a bachelor, and his asserted continuous residence

with his own parents, brothers, or sisters during the time appellee's witnesses said he was at the Gormley farm or elsewhere with appellee and his mother. Horatio P. Mays, the one of decedent's brothers whom appellee's witnesses placed at the Gormley farm on a visit to see the decedent and the baby, made what may fairly be called a guarded response to the direct question of his brother's marriage. He testified: "Q. Did you ever know of his [decedent's] ever being married? A. Well, I never saw any records to prove it." This witness' denial of ever having returned to the Gormley farm after his original visit was likewise not positive. The following appears in the record: "Q. Were you ever back to the Neil Gormley farm yourself after 1890? A. Well, I was back there a few years ago and I can't remember of ever being back before that except when I worked there."

There was also evidence of a search of the marriage license dockets of Allegheny County, and the finding of no license to the decedent and appellee's mother during the years 1890 to 1895. This was offered in contradiction of her alleged statement that the marriage had taken place "at a mission in Lawrenceville."

This evidence of appellants is obviously less than the clear, direct, satisfactory, and irrefragable proof demanded to overcome the presumption of appellee's legitimacy. What we said in *McAnany's Estate, supra,* is applicable and conclusive here. As this court said in *McAnany's Estate, supra* (p. 327): "The presumption of legitimacy is not to be shaken by a mere balancing of probabilities; the evidence to repel it must be strong, satisfactory and conclusive, and we are of the opinion that the appellant has failed to produce such evidence in this case."

All the assignments of error are overruled.

. The decree of the court below is affirmed, at the costs of appellants.