Smith Estate.

Argued November 10, 1947. Before RHODES, P. J., HIRT, DITHRICH, ROSS, ARNOLD and FINE, JJ. (RENO, J., absent.)

*E. Y. Calvin*, with him *Leonard L. Ewing* and *Reed & Ewing*, for appellant.

*John N. Sawyer*, with him *Forest G. Moorhead*, *John G. Marshall* and *Moorhead, Marshall & Sawyer*, for appellee.

OPINION BY ARNOLD, J., March 8, 1948:

The orphans' court affirmed findings, conclusions and order of distribution of its auditor, by which there was awarded to Elmer Minster $1614 on a claim for room rent, under an oral contract with the decedent, at the rate of $2.00 per week for fifteen years and twenty-seven weeks. The heirs appealed.

The claimant called as witnesses only his two daughters, Helen M. Nichols and Edith M. Hills. The latter's evidence is of no moment. She left home in 1926 and thereafter visited her parents at least weekly. She only testified that the room in question was not rented to anyone else, and that some of the decedent's personal

effects remained, after 1930, in the room he had formerly occupied.

The validity of the claim then rests upon the testimony of but a single witness, claimant's daughter, Mrs. Nichols. Her evidence is not of the quality required whether described as "clear, precise and indubitable," as in *Mooney's Estate,* 328 Pa. 273, 194 A. 893, or "beyond a reasonable doubt", as in *Conrad's Estate,* 333 Pa. 561, 3 A. 2d 697, and *Rae's Estate,* 345 Pa. 48, 25 A. 2d 706. The staleness of the claim makes it particularly suspicious: *Bechdel's Estate,* 344 Pa. 139, 23 A. 2d 859; *Mays' Estate,* 141 Pa. Superior Ct. 479, 15 A. 2d 569. The fact that the only witness is the daughter of the claimant also requires careful scrutiny of her testimony; for while it is unlikely that she would withhold any evidence favorable to her father, it is also improbable that she would not go as far as she could to help his cause. Her testimony is epitomized in the following narrative:

Thomas A. Smith, the decedent, was a man of ample means,[1] and in 1914 was the owner of a farm near Tullytown, Pa. (population about 700), which he used as winter quarters for his circus. At this time he secured a room, and sometimes board, from Elmer Minster, the claimant. For the room alone he paid $2.00 per week, and with board $7.00 per week. The family then consisted of the claimant, Elmer Minster, and his wife (who died in 1937), and the two daughters, Helen M. Nichols and Edith M. Hills, who were then unmarried.

Smith left the Minster home in 1930, and no claim is made for anything prior to that date. There remained in the room which he occupied two trunks and other articles, including some wearing apparel. In the attic were some of his old magazines.

---

[1] The present first and partial account, after deduction of all expenses and of all debts (except the instant claim) shows a balance for distribution of $26,860.25; the gross amount as shown in this account being in excess of $35,000.

None of the Minster family ever saw him or had any communication with him for eleven years, that is, until 1941.

In 1941 he returned to the house, apparently for the purpose of selling the farm used as winter quarters for the circus. He was in the Minster house about forty or sixty minutes.[2] He was disturbed because the Minsters had moved his trunks in order to clean the room. He went through his trunks and belongings and removed some things which he wanted to take with him.

During this visit, in a conversation with the witness and her father, he said that he wanted his trunks and things left entirely alone. When asked about getting rid of his effects, so that more than $2.00 a week could be obtained for the room, he said that he didn't have time then, but that he would be right back and pack up, and "after he got straightened out, then, he would straighten us all up, in regards to our room rent . . . . He said he would pay up the back rent. . . ." and remove his things when he got more time; that "he was paying for the room and wanted it left as it was, regardless of dust or anything else." After this conversation Smith left.

None of the Minsters ever saw him again, nor did they have any kind of communication with him. The claimant made no request for payment of the alleged rent at any time before or after the 1941 conversation, but that this was because they considered Smith as a member of the family, and that he led them to believe that he would pay all that he owed, and always said, "Don't worry; you will be taken care of."

Thomas A. Smith died December 24, 1944, and the Minsters learned of his death by reading of it in "Billboard", an amusement periodical.

---

[2] Record 41(a). But at 10 (a), when testifying in favor of Muriel Miles (later referred to in this opinion) she testified that he stayed at the Minster home for two or three days.

Helen Nichols had become postmistress at Tullytown, and shortly after Smith's death she received an envelope addressed to "Postmaster", containing a letter from the Beaver County Trust Company, stating that it was administrator of Smith's estate and that it was looking for a possible will and any other papers. Inclosed with this was a letter to "Baker Brothers" who had bought the winter quarters farm from Smith, apparently in 1941. Mrs. Nichols told her father of this letter, and they investigated the contents of the trunks and papers, but none of them replied to the Beaver County Trust Company's letter. Instead, they gave the letter to Baker Brothers, who promised to look after it.

No claim was then made by Elmer Minster or any of his family for this "back rent."

The situation thus remained until a representative of one Muriel Miles called at the Minster home. She claimed to take the whole estate as the legitimate daughter of the decedent. With knowledge that an administrator of Thomas A. Smith had been appointed, the Minsters nevertheless gave the representative of Muriel Miles full access to the effects of Smith. They searched the trunks and bureau drawers and took certain articles, including photographs.

Nothing more occurred until March 21, 1946 (more than fifteen months after Smith's death), when the claimant's daughter, Helen Nichols, appeared before the auditor of the orphans' court as a witness,—*not on behalf of her father but on behalf of Muriel Miles.*[3] Mrs. Nichols then testified on behalf of Muriel Miles, and after the testimony of other witnesses, an adjournment was had until Monday, May 27, 1946. Not until May 16, 1946, was the present claim of Elmer Minster filed with the auditor. On May 27, 1946, the adjourned hearing was had, and after closing the testimony in the Muriel Miles matter the Minster claim was formally presented, and was objected to by the heirs and administrator, but

---

[3] This claim was disallowed.

counsel for Muriel Miles stated that while they would not admit the claim, they would not object to it. After completing the testimony in the Muriel Miles matter, an adjourned hearing was set for June 7.

This is the sum total of her relevant testimony, except that she testified that no room rent had been paid since 1930. This must be rejected because her knowledge of this alleged fact was from one of two sources: either Thomas A. Smith, the decedent, or Elmer Minster, her father. If she learned it from Smith, it was, of course, competent and relevant as an admission, and the fact that she did not so testify is almost conclusive that no such admission was made by him in her presence. If she learned it from Elmer Minster, her father and the claimant, it was not only hearsay, but a purely self-serving declaration. Such testimony cannot be accepted, and the fact that the witness states that she "knows" does not make the testimony competent where, as here, there are but these two sources of information. The statement means no more than that, insofar as the witness knows, no payment was made.

In this case, therefore, there is no evidence which is even partially satisfying to explain why Elmer Minster allowed this rent claim to remain from 1930 to 1941 (then in an aggregate amount of over $1000) without any request for payment, and with no communication from Thomas A. Smith.

Likewise there is no evidence which is even partially satisfying to explain why, after learning in January, 1945, that Smith was dead, no claim was made or suggested until May 16, 1946. Even in the conversation of 1941 no request for payment was made, and with the exception of that brief conversation, no communication was had with the decedent or with his administrator for more than sixteen years. There is no explanation of why the Minsters, who claimed that they considered Smith a member of the family, would throw open his papers and personal effects to the inspection and examination of the

representatives of Muriel Miles, and permit these representatives to take away photographs and possibly other articles. If, as is claimed, Smith was being charged rental for the room which he had not occupied, but in which he kept personal property, a duty was owed by his landlord to permit no one but the administrator to examine his things, or to take any of the articles. There is no explanation given of why the claim was not presented to the auditor or the administrator until after Helen Nichols appeared and testified as a witness for Muriel Miles.

Not only does the quality of the evidence fail, but certainly such declarations as "you will be taken care of", and, "I will straighten out the back room rent" (with no amount mentioned), such as allegedly used by the decedent in 1941, do not, under the circumstances disclosed here, amount to more than loose declarations, which in so many cases have been condemned as a basis for a claim.

The decree of the lower court is reversed, and the record is remanded with instructions to dismiss the claim of Elmer Minster, and to make distribution in accordance with this opinion. Costs to be paid by the estate.