393 A.2d 796

**COMMONWEALTH of Pennsylvania ex rel. John C. ERMEL, Appellant,**

v.

**Romayne B. ERMEL, Respondent.**

Superior Court of Pennsylvania.

Argued Dec. 13, 1977.

Decided Oct. 20, 1978.

Charles P. Gelso, Wilkes-Barre, with him John P. Moses, Wilkes-Barre, for appellant.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This is an appeal from an order denying appellant visitation of a child then 4, now 5, years old, on the basis that appellant is not the child's father. Because we find that appellee failed to rebut the presumption of legitimacy, we reverse.

Appellant, John C. Ermel, and appellee, Romayne Ermel, were married on August 29, 1959. Rita Ann, the child in question, was born on October 17, 1972. At that time the parties were living together. Three years later, in October 1975, the parties separated; they are still married. From the date of separation appellant has encountered difficulties in attempting to visit Rita Ann. As the result of a habeas corpus petition filed by appellant on July 26, 1976, a stipulation providing for visitation was entered into. However, when appellee did not conform to the stipulation, appellant

filed a second habeas petition on November 12, 1976. At the hearing on the petition appellee testified that appellant had sexually molested Rita Ann. N.T. 25. She also testified that appellant is in fact not Rita Ann's father. N.T. 33–34. The lower court found that appellant had not molested the child, but also found that appellant is not Rita Ann's father, and this basis denied visitation.

–1–

█ In *Cairgle v. American Radiator & Standard Sanitary Corp.,* 366 Pa. 249, 255, 77 A.2d 439, 442 (1951), the Supreme Court stated:

> The presumption of legitimacy is, however, still one of the strongest known to the law and can be overcome only by proof of facts establishing non-access or that the husband was impotent or had no sexual intercourse with his wife at any time when it was possible in the course of nature for the child to have been begotten: *Dennison v. Page,* 29 Pa. 420, 422; *Dulsky v. Susquehanna Collieries Co.,* 116 Pa.Super. 520, 525, 177 A. 60; *Janes's Estate,* 147 Pa. 527, 530, 23 A. 892. This is the modern rule.
>
> . . . . .
>
> In order to successfully rebut the presumption of legitimacy, the evidence of non-access or lack of sexual intercourse or impotency must be clear, direct convincing and unanswerable *Thorn Estate,* 353 Pa. 603, 606, 46 A.2d 258; *Mays' Estate,* 141 Pa.Super. 479, 489, 15 A.2d 569; *McAnany's Estate,* 91 Pa.Super. 317, 327, although it is not necessary that the possibility of access be completely excluded: *Mays' Estate,* 141 Pa.Super. 479, 15 A.2d 569; *Commonwealth v. Barone,* 164 Pa.Super. 73, 63 A.2d 132; *Commonwealth v. Gantz,* 128 Pa.Super. 97, 193 A. 72; *Dulsky v. Susquehanna Collieries Co.,* 116 Pa.Super. 520, 531, 177 A. 60; *Commonwealth v. DiMatteo,* 124 Pa.Super. 277, 188 A. 425; *In re Findlay,* 253 N.Y. 1, 170 N.E. 471 (opinion by Judge CARDOZO).

This court has recently had the occasion to consider and apply this statement, in *Burston v. Dodson,* 257 Pa.Super. 1,

390 A.2d 216 (1978). In both *Cairgle* and *Burston* the lower court found the evidence sufficient to rebut the presumption of legitimacy, and in both on appeal the court's order was affirmed. As appears from both cases, the evidence will be held sufficient only if it is of "overwhelming weight." *Cairgle* at 366 Pa. 258, 77 A.2d at 443; *Burston,* 257 Pa.Super. at 13, 390 A.2d at 222. *And see Commonwealth v. Ludlow,* 206 Pa.Super. 464, 214 A.2d 282 (1965); *Commonwealth v. Fletcher,* 202 Pa.Super. 65, 68–69, 195 A.2d 177, 178–179 (1963); *Commonwealth v. Carrasquilla,* 191 Pa.Super. 14, 155 A.2d 473 (1959); *Commonwealth v. Levandowski,* 134 Pa.Super. 477, 4 A.2d 201 (1939).

■ The evidence in regard to Rita Ann's paternity was as follows. Appellee, in the midst of testifying about the alleged molestation incident, stated that "[n]ow, John is not Rita Ann's natural father, he is aware of this." N.T. 33. She admitted, however, that she had listed appellant as Rita Ann's father on her birth certificate, N.T. 46, 57, and further, that she had filed a private criminal complaint for support in which she averred that appellant was Rita Ann's father, N.T. 57–59. Also, while claiming that she had committed adultery, she refused to name Rita Ann's father. N.T. 46–47. Appellee's sister testified that during appellee's pregnancy appellee had told her that appellant was not Rita Ann's father. N.T. 100. She further testified that on October 17, 1975, appellant had also told her that he was not Rita Ann's father. N.T. 99. Appellant testified that no one, including appellee, had ever told him that he was not Rita Ann's father; that he had never told anyone that he was not her father; and that he had no reason to believe that he was not her father. N.T. 91–92. As already indicated, the evidence established that Rita Ann was born while the parties were married and were living together. There was no evidence of appellant's non-access to appellee, or that he was impotent, or had not had sexual relations with appellee at a time when Rita Ann could have been conceived.*

* There is no blood test evidence. Originally appellant indicated a willingness to submit to a blood test. However, when appellee

■ In considering the sufficiency of this evidence we need not determine the weight to be given the alleged admission by appellant to appellee's sister that he was not Rita Ann's father, for the lower court did not find that this admission occurred. The court stated: "Either he [appellant] forgot the conversation Mrs. Lonie [appellee's sister] testified he had with her in October, 1975, in which she testified he told her that he was not Rita Ann's father, or as he testified, he never told her or anyone that he was not Rita Ann's father." Lower court opinion at 7. Therefore, while we must defer to a lower court's appraisal of the witnesses' credibility, *Burston v. Dodson, supra; Commonwealth ex rel. Tobias v. Tobias,* 248 Pa.Super. 168, 374 A.2d 1372 (1977); *In the Interest of Clouse,* 244 Pa.Super. 396, 368 A.2d 780 (1976); *Clair Appeal,* 219 Pa.Super. 436, 281 A.2d 726 (1971), here the only evidence that the court found credible was appellee's assertion that appellant is not Rita Ann's father. This assertion, when balanced by the evidence of the birth certificate, the support petition, and appellant's marriage and access to appellee, is not the "overwhelming evidence," *Cairgle v. American Radiator & Standard Corp., supra; Burston v. Dodson, supra,* required to overcome the presumption of legitimacy; it falls far short of "mak[ing] it clearly appear that the husband was not the father of the child," *Commonwealth v. Fletcher, supra,* 202 Pa.Super. at 68, 195 A. at 178. Therefore, the presumption of legitimacy stands unrebutted, and the lower court erred in finding that appellant was not Rita Ann's father.

–2–

The lower court concluded: "[O]n the basis of the finding of fact that John C. Ermel is not the natural father of Rita Ann Ermel, and for no other reason, that the petition of

refused to reveal the name of the alleged father, appellant stated that he would only submit to a blood test if appellee would agree that if the test revealed that he was included within the group of possible fathers, appellee would stipulate that he was in fact the father. When appellee refused to make this stipulation, no test took place. The lower court properly did not order appellant to submit to a blood test. *See Adoption of Young,* 469 Pa. 141, 364 A.2d 1307 (1976).

John C. Ermel for reasonable visitation with Rita Ann Ermel must be denied." Lower court opinion at 11. Since, as just discussed, the lower court's finding of fact was error, it is necessary to determine whether the record discloses any reason to deny appellant his right of reasonable visitation.

In *Commonwealth ex rel. Peterson v. Hayes*, 252 Pa.Super. 487, 381 A.2d 1311, 1312–13 (1977), we said:

> A parent is rarely denied the right to visit a legitimate child. Visitation has been limited or denied only where the parent has been shown to suffer from severe mental or moral deficiencies that constituted a grave threat to the child. *Commonwealth ex rel. Lotz v. Lotz*, 188 Pa.Super. 241, 245, 146 A.2d 362, 364 (1958); *see Commonwealth ex rel. Heston v. Heston*, 173 Pa.Super. 260, 98 A.2d 477 (1953); *Leonard v. Leonard*, 173 Pa.Super. 424, 98 A.2d 638 (1953). Visitation has been granted parents who have ignored their children for a long period of time, *Commonwealth ex rel. Turner v. Strange*, 179 Pa.Super. 83, 115 A.2d 885 (1955); *Commonwealth ex rel. Boschert v. Cook*, 122 Pa.Super. 397, 186 A. 229 (1936), who have failed to support their children, *Scott v. Scott*, 240 Pa.Super. 65, 368 A.2d 288 (1976); *Commonwealth ex rel. Lotz v. Lotz, supra*, who have engaged in marital misconduct or who have lived with lovers, *Commonwealth ex rel. Sorace v. Sorace*, 236 Pa.Super. 42, 344 A.2d 553 (1975); *Commonwealth ex rel. McNamee v. Jackson*, 183 Pa.Super. 522, 132 A.2d 396 (1957), and even to parents whose children did not want to see them, *Fernald v. Fernald*, 224 Pa.Super. 93, 302 A.2d 470 (1973); *Commonwealth ex rel. Turner v. Strange, supra.*

Appellee testified that appellant had sexually molested Rita Ann:

> A. [appellee]: She [Rita Ann] told me that her daddy had put his hand into her pants and he had touched her on the outside of her vagina. She showed me exactly where. She was laying on the bed.
>
> Q. Did she use the word vagina?
>
> A. Of course not.

Q. What was the word used?

A. She said he touched me with his fingers here, mommy, and she pointed, right? She said, I asked him not to do it, mommy, because it hurt and he did it anyway.

N.T. 84.

Rita Ann testified as follows:

MRS. ERMEL: He wants to know if he did anything to you, not to me, honey.

MISS ERMEL: Well, he once stuck his hands in my pants and just—that's not nice.

MR. ERMEL: Who told you that?

MISS ERMEL: I'm not telling.

MRS. ERMEL: Talk to thé judge.

THE COURT: All right, he put his hand in your pants, what else did he do?

MISS ERMEL: He touched my tushy.

THE COURT: And then after he left, what happened?

MISS ERMEL: It started to hurt.

N.T. 118–119.

. . . . .

MISS SERNAK [appellee's counsel]: Are you afraid of your daddy?

MISS ERMEL: No.

MISS SERNAK: Are you afraid that he will hurt you?

MISS ERMEL: No.

MISS SERNAK: Did he ever hurt you?

MISS ERMEL: No, just that one time.

MISS SERNAK: Just that one time.

MISS ERMEL: Just that one time when he stuck his hands in my pants and felt my tushy, my butt, I mean my tushy. So that's only one day that he hurt me.

N.T. 130.

Appellee denied that this occurred. N.T. 92. In assessing the conflict in testimony thus created, it is necessary to consider Rita Ann's medical history. She has had a history of recurrent urinary tract infections from the age of one

that require particular parental attention so as to ensure that she is kept clean. *See* Deposition of Harold E. Brown, M. D. Consequently, an adult must assist her when she goes to the bathroom. N.T. 84–85. (Appellant has taken a special course in child hygiene and cleaning at the Pittson Hospital School of Nursing. N.T. 5.)

Given this record, we find no reason to disturb the lower court's finding that "there is no merit to Mrs. Ermel's charge that Mr. Ermel sexually molested Rita Ann Armel." Lower court opinion at 10.

Appellee's attitude toward her husband, demonstrated by her charge of molestation, was further demonstrated by other evidence. Appellee testified that after she and appellant separated, at the end of October 1975, appellant made only four or five support payments. N.T. 36. However, eleven checks payable to appellee, from December 11, 1975, to June 23, 1976, were introduced into evidence. N.T. 36–39. Appellant testified that he only stopped making support payments after appellee terminated all visitation in June, 1976. N.T. 10. In August 1976, in open court, the parties agreed that appellant would be allowed to visit Rita Ann on Sunday afternoons from 1:30 to 2:30 p. m., and on Tuesday evenings from 5:00 to 8:00 p. m., N.T. 11. From the date of the agreement until the hearing on December 30, 1976, appellant had been allowed to visit Rita Ann once on a Sunday, and twice on Tuesdays. Finding of Fact # 9, lower court opinion at 3.

Other than the allegation of molestation, appellee has not made any allegation that suggests that would constitute a grave threat to Rita Ann to permit appellant to visit her. This fact, however, does not end our inquiry; although visitation has been awarded to parents whose children did not want to see them, *Fernald v. Fernald, supra; Commonwealth ex rel. Turner v. Strange, supra,* a child's preference should nevertheless be considered, particularly in regard to whatever underlying problems the child's preference reveals.

At a hearing in chambers, Rita Ann expressed her dislike of her father most vividly and vehemently. She called him a

brat, a rat, and a big liar, and she told him not to look at her.  N.T. 117, 121, 123.  However, she also testified as follows:

> MR. MOSES [appellant's counsel]:  Rita Ann, when your father comes to the house and plays with you, do you enjoy it, do you like it?
>
> MISS ERMEL:  Um-hum.
>
> MR. MOSES:  And did he ever do anything to hurt you when he came to play with you?
>
> MISS ERMEL:  No.
>
> MR. MOSES:  The thing that has you mad is because he's upsetting your mother, isn't it?
>
> MISS ERMEL:  Yes.
>
> MR. MOSES:  And that is what you are mad about, isn't it?
>
> MISS ERMEL:  Yes.
>
> MR. MOSES:  If your daddy wouldn't upset your mother anymore would you want to see him and visit with him?
>
> MISS ERMEL:  Yes.
>
> N.T. 123.

And:

> MR. ERMEL:  Honey, didn't you tell me once that gramma told you that I'm a pig because I don't give mommy any money?
>
> MISS ERMEL:  Um-hum.
>
> MR. ERMEL:  Did gramma tell you that?
>
> MISS ERMEL:  Gramma did tell me that.
>
> MR. ERMEL:  And did she also tell you, honey, that the reason is because I don't love you?
>
> MISS ERMEL:  Yes.
>
> MR. ERMEL:  She told you that, too?
>
> MISS ERMEL:  Yes.
>
> MR. ERMEL:  That I don't love you and that I don't want to see you?
>
> MISS ERMEL:  Yes.
>
> N.T. 128–29.

Appellant described the visitation he was allowed to have with Rita Ann as follows:

A. [appellant]: When I came there the second Tuesday night, they weren't necessarily out of the room, their presence was known, and my daughter and I did what we normally would do, we brought some toys out to start to play and Romayne started yelling at the child that gramma and mommy just cleaned up, we're not going to have you messing up this house, and she took the toys and she got very upset and started to cry. She was confused. I didn't know what to do. They just walked out of the room and left her that way, so I put her on my knee and somebody walked back in the room and said, leave those books alone, too.

Q. Are you telling the Court that the respondent and her mother would not allow you to use the child's toys?

A. No toys whatsoever.

Q. And they would not allow you to use the child's books to read to the child?

A. So I had to think of something fast because it really left me high and dry with her, so I started to make up a story about Raggedy Ann and Andy, and I pretty well calmed her down and she was getting a big kick out of it.

Q. When you left that night was there any confrontation between you and your wife and your mother-in-law?

A. No, the little girl saw me to the door and she wanted to kiss me good night but they got in between us and started shoving me out, in other words, handing me my coat and saying, get going, and they were very belligerent and they wouldn't even let me say good night to her.

Q. Was that in the presence of your daughter?

A. Yes. Your time's up, get going.

N.T. 13–14.

Appellant further testified:

Q. Why does she get nervous or upset while you are there?

A. She can't understand why she can't play with her toys, she can't understand why she can't play with normal little things with me, she cannot understand why everytime I appear at that house for my visitation there is trouble, as soon as I walk in there is trouble and she clams right up. She says, mommy, can I tell daddy about my new toy? She has to ask permission, she has to ask if she has a glass of water and she has to ask permission to talk on various subjects. She starts a conversation, they come in and say, don't tell him that, it's none of his business, he's not taking care of you, we are.

N.T. 30.

It therefore appears that Rita Ann was justified in disliking appellant's visits. This does not mean, however, that visitation should be denied. To deny appellant visitation because appellee has made his visits unpleasant would amount to the court surrendering its responsibility in the face of appellee's displeasure, and would be unjust both to appellant and to Rita Ann. Unless visitation is reinstated, appellant will not have the opportunity to re-establish and to deepen his relationship with his daughter. *See Hooks v. Ellerbe*, 257 Pa.Super. 219, 390 A.2d 791. Rather than deny visitation, it is the lower court's responsibility to include in its order safeguards designed to limit the friction between the parties. In this regard, it would appear that visitation should occur away from appellee's house; also, if the court sees fit, it could order that visitation occur at a specified location or under the supervision of a court-appointed individual. In any case, whatever safeguards are provided, the goal should be to ensure that Rita Ann's best interests are preserved by allowing her to maintain her relationship with both of her parents.

The order of the lower court is reversed, and the case is remanded for further proceedings consistent with this opinion.

230

WATKINS, former President Judge, and HOFFMAN, J., did not participate in the consideration or decision of this case.