**McKENZIE, Mary E.**

v.

**HARRIS, Patricia, Secretary of Health & Human Services of the United States, Mary McKenzie, Appellant.**

No. 81–2520.

United States Court of Appeals, Third Circuit.

Argued March 3, 1982.

Decided May 21, 1982.

* Sitting by designation.

Stephen T. Shaffer (argued), Stephen T. Shaffer & Assoc., P. C., Philadelphia, Pa., for appellant.

Larry H. Bailine (argued), Asst. Regional Atty., David R. Culp, Acting Regional Atty., Region III, Dept. of Health & Human Services, Washington, D. C., Peter F. Vaira, U. S. Atty., Dawn MacPhee, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Before HUNTER, WEIS and HIGGIN-BOTHAM, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

The appellant in this case (Mary McKenzie, also known as Mary Williams) seeks surviving children's Social Security insurance benefits ("benefits") for her two children based upon the earnings record of the deceased wage earner, William McKenzie ("the decedent"). A hearing was held be-fore an Administrative Law Judge ("ALJ") in Tulsa, Oklahoma, and the ALJ denied appellant's claim on the ground that there was no marriage relationship between appellant and the decedent; thus, the children were not eligible for benefits.[1] After the Appeals Council of the Department of Health and Human Services ("HHS") affirmed the ALJ's decision, appellant filed a complaint in the United States District Court for the Eastern District of Pennsylvania, where appellant and HHS filed cross-motions for summary judgment. The case was referred to a magistrate, who recommended that appellant's motion for summary judgment be granted. The trial court declined to follow that recommendation, denied appellant's motion for summary judgment, and entered summary judgment for HHS. Mary McKenzie has appealed.

## DISCUSSION

The parties agree that the two children would be entitled to benefits if the appellant and the decedent were married at the time of his death in late 1971 and if the children were the decedent's children or stepchildren. The criteria for determining whether the appellant and the decedent were married are set forth in 42 U.S.C. § 416(h)(1)(A):

> An applicant is the wife, husband, widow, or widower of a fully or currently insured individual for purposes of this subchapter if the courts of the State in which such insured individual is domiciled at the time such applicant files an application, or, if such insured individual is dead, the courts of the State in which he was domiciled at the time of death, ... would find that such applicant and such insured individual were validly married at the time such applicant files such application or, if such insured individual is dead, at the time he died.

The criteria for determining whether the claimant's two children are children of the decedent appear in 42 U.S.C. § 416(e):

---

1. Although the ALJ recognized that Pennsylvania law would supply the rule of decision and that Pennsylvania law recognizes a common law marriage relationship, appendix at 15, he was apparently unaware of the specific presumptions established by Pennsylvania law and discussed *infra*.

The term "child" means (1) the child or legally adopted child of an individual, (2) a stepchild who has been such stepchild for not less than one year immediately preceding the day on which application for child's insurance benefits is filed or (if the insured individual is deceased) not less than nine months immediately preceding the day on which such individual died....

In determining whether an individual is a "child" for Social Security purposes, the "Secretary shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual ... was domiciled at the time of his death." 42 U.S.C. § 416(h)(2)(A). *See* 20 C.F.R. § 404.354(b) ("To decide your relationship to the insured, we look to the laws of the State ... where the insured had a permanent home when he or she died....").[2]

The parties agree that Pennsylvania law applies in this case whenever the federal law or regulations call for the application of state law, and that, if the parties were married, it was pursuant to the common law and not pursuant to the marriage licensing statutes.

■ The first inquiry is whether appellant and the deceased were married. In Pennsylvania, "[c]ohabitation of a man and a woman, both of whom are capable of contracting marriage, and a reputation as husband and wife in their community together raise a presumption that the parties have contracted marriage." *In re Estate of Garges*, 474 Pa. 237, 241, 378 A.2d 307, 309 (1977). Evidence that two persons agreed to be married and agreed that they were married has been held sufficient to establish a common law marriage. *Garges*, 474 Pa. at 241–42, 378 A.2d at 309; *see Gower*

*Estate*, 445 Pa. 554, 556, 284 A.2d 742, 743 (1971).

■ In this case, there was uncontroverted evidence before the ALJ that the applicant lived with the decedent continually from 1962 until his death in 1971. Appendix at 43. The applicant and the decedent introduced each other as husband and wife and were known by friends and many business acquaintances as husband and wife. Appendix at 31, 33–34. Although plaintiff used her maiden name (Mary Williams) professionally, she was known as Mary McKenzie by her friends and relatives. Appendix at 30–31. Appellant and the decedent executed and delivered as husband and wife a mortgage for the purchase of real property. Appendix at 102. Appellant considered herself the decedent's wife. Appendix at 42. The decedent, in his will, left all of his property to appellant, to whom he referred as his "common law wife." Appendix at 105. Finally, in 1962, when they began to live together, appellant and the decedent had the capacity to enter into a marriage with each other. Appendix at 15. This evidence is sufficient to raise the presumption that appellant and the decedent entered into a common law marriage in 1962 when they began to live together.[3]

■ There was some evidence before the ALJ which would weigh against the existence of a common law marriage. The decedent checked the "divorced" box in an application for retirement benefits filed in March, 1971. Appendix at 51.[4] The birth certificates for the two children involved here did not list the decedent as their father, appendix at 69–72, and the decedent did not affirmatively state on various forms he filled out that he had children. However, evidence relating to appellant's chil-

---

2. An additional criterion for determining whether a child is the stepchild of an insured individual is set forth in 20 C.F.R. § 404.357:

    You may be eligible for benefits as the insured's stepchild if, after your birth, your natural or adopting parent married the insured. The marriage between the insured and your parent must be a valid marriage under State law....

3. The Veteran's Administration, in a proceeding unrelated to this case, found that appellant and the decedent were married. Appendix at 16.

4. The application did not list "common law marriage" as a category. As decedent's will makes clear, the decedent regarded appellant as his "common law wife."

dren does not necessarily go to the question of whether or not there was a marriage between appellant and the decedent, and certainly would not be enough to rebut the presumption of a marriage raised by the evidence in this case.[5]

Thus, the facts here fulfill each of the most important criteria for determining the existence of a common law marriage: an intention to be married (the applicant testified that she considered herself married to the decedent, the decedent stated in his will that he was married to the applicant), cohabitation (the applicant and the decedent lived together continuously for a period of nine years), and reputation (the applicant and the decedent were known in their community as married). The evidence introduced to rebut the presumption of common law marriage was insufficient to do so, and the ALJ's decision that the parties were not married was not supported by substantial evidence.[6]

That the applicant and the decedent were married does not end this case. The second issue, which the ALJ did not reach, is whether the two children were the decedent's children within the meaning of the applicable statute and regulations. Again, we turn to the law of Pennsylvania for the answer.[7]

■ The common law marriage of the applicant and the decedent began in 1962 and lasted through 1971. The children were born in 1964 and 1966, during the marriage. When a child is born during a marriage, that child is presumed legitimate. *Commonwealth v. O'Brien*, 390 Pa. 551, 555, 136 A.2d 451, 453 (1957). That presumption is "tremendously strong," *Manfredi Estate*, 399 Pa. 285, 289, 159 A.2d 697, 699 (1960), and "one of the strongest known to the law. . . . In order to successfully rebut the presumption of legitimacy, the evidence of non-access or lack of sexual intercourse or impotency must be clear, direct, convincing and unanswerable." *Cairgle v. American Radiator & Standard Sanitary Corp.*, 366 Pa. 249, 255–56, 77 A.2d 439, 442 (1951), quoted in *Commonwealth ex rel. Ermel v. Ermel*, 259 Pa.Super. 219, 221, 393 A.2d 796, 797 (1978).

That a child born during a marriage is not a child of the marriage may only be shown by "overwhelming" evidence of non-access, lack of intercourse, or impotency. *Ermel*, 259 Pa.Super. at 222, 393 A.2d at 797. The evidence must not only be overwhelming, but must also come from sources other than the mother or the husband. The Pennsylvania Supreme Court has stated on numerous occasions that neither the mother nor the husband may testify that the husband did not have access to the mother at or near the time the child was conceived, at least where that testimony would render the child illegitimate. *See, e.g., Commonwealth ex rel. Leider v. Leider*, 434 Pa. 293, 295–96, 254 A.2d 306, 308 (1969); *Cairgle*, 366 Pa. at 256, 77 A.2d at 442.[8]

5. There was additional evidence which would tend to support the conclusion that appellant and the decedent were not married to each other. Appellant was the "informant" for the decedent's death certificate; ·on that certificate, the "divorced" box was checked with a typewriter. Appendix at 59. However, appellant also filled out an Application for Lump-sum Death Payment; on that application appellant called herself Mary E. Williams McKenzie and stated that she and the decedent had been married on October 15, 1961. Appendix at 55–56.

Even if we were to give the same weight to form answers apparently typewritten by someone other than appellant and to form answers apparently handwritten by appellant herself, the evidence to be gleaned from the forms is equivocal. Given the presumption of marriage raised by the evidence in this case, equivocal evidence such as that introduced here is insuffi-cient to prove that the decedent and appellant were not married to each other.

6. The ALJ apparently weighed the evidence on the marriage issue without taking the Pennsylvania presumption into account, and the record does not indicate that the presumption was brought to his attention.

7. The ALJ, in his opinion, stated that "[r]egardless of the paternity of the children they would be recognized as the lawful issue of her marriage to wage earner if there was a marriage relationship." Appendix at 15–16.

8. The mother and the husband are *incompetent* to testify to non-access. *Leider*, 434 Pa. at 297, 254 A.2d at 309. Thus, their testimony would be inadmissible in federal court under Federal Rule of Evidence 601.

█ It seems to us that the rule that the mother and the husband are incompetent to testify to non-access means also that neither the mother nor the husband may testify to impotency. The presumption of legitimacy "is designed to avoid the finding that a child is illegitimate, if at all possible." *Leider*, 434 Pa. at 298, 254 A.2d at 309. A husband or mother is incompetent to testify to non-access "if the result of such testimony would be to bastardize her children." *Leider*, 434 Pa. at 297, 254 A.2d at 309.[9] These rationales would support barring testimony from the couple as to impotency as well as non-access, and certainly preclude relying on testimony of impotence from the couple where that testimony is the sole evidence of impotence. Here, the only evidence as to impotency came from appellant's testimony, given in response to questions from the ALJ, appendix at 44–45. There was evidence that appellant gave names other than the decedent's for inclusion as the father on the birth certificates, appendix at 46–47, and that the decedent failed to list the children on various forms; however, such evidence does not directly concern impotency at all, and certainly does not constitute overwhelming evidence of impotency.[10]

9. In *Leider*, the Supreme Court of Pennsylvania stated that avoiding this result is the primary justification for the rule. 434 Pa. at 296–97, 254 A.2d at 308–09.

10. The ALJ, while he referred to the decedent's "lack of libido," appendix at 15, did not find as a fact that the decedent was impotent.

In *Commonwealth ex rel. Savruk v. Derby*, 235 Pa.Super. 560, 344 A.2d 624 (1975), the Superior Court of Pennsylvania explicitly abandoned the rule that the mother is incompetent to testify to non-access. In that case, the mother and putative father of the child lived together and held themselves out as husband and wife even though the mother was married to someone else. The husband filed for a divorce in 1966. The wife began living with the putative father in 1967; the child was born in 1969. The mother was divorced from her husband in 1970. There was testimony that the putative father had publicly admitted being the father of the child. In 1970, however, after the mother's divorce, the putative father disowned the child, and the mother filed suit against the putative father for child support. If the mother's evidence of non-access had not been admitted, the trial court would have been forced to rule against the mother. 235 Pa.Super. at 566, 344 A.2d at 627. The Superior Court affirmed the trial court's action in admitting her testimony of non-access and in holding the putative father liable for child support.

In *Commonwealth ex rel. Johnson v. Peake*, 272 Pa.Super. 340, 415 A.2d 1228 (1979), the mother, in the course of trying to obtain child support from the putative father, testified that she had been separated from her husband since 1956; that she and the putative father (who was married to someone else) had begun having sexual relations in 1959; that her relationship with the putative father had lasted from 1959 through 1977; that her child, the subject of the suit, had been born in 1965; and that she had had sexual relations with no one but the putative father during the year prior to the child's birth. The mother's evidence of non-access by her husband, which was the only direct evidence of non-access, was admitted, and the putative father was ordered to pay child support.

We decline to rule in this case that the mother's testimony of impotence (which was the only direct evidence of impotence) is sufficient to overcome the presumption of legitimacy. We have been unable to find any opinion of the Supreme Court of Pennsylvania abrogating the rule that the mother and husband are incompetent to testify to non-access where such testimony would "bastardize[ ]" the child. *See Leider*, 434 Pa. at 296–97, 254 A.2d at 308–09. In this case, appellant's testimony of impotency would render her children illegitimate, and the *Leider* rule requires its exclusion.

Moreover, this case is distinguishable on its facts from both *Savruk* and *Johnson*. In those cases, the mothers had had no contact with their husbands for a number of years prior to the births of the children involved, and had had contact with the putative fathers of the children. There was also strong affirmative evidence in both of those cases that the specific putative father was in fact the father of the child involved. Here, we are not dealing with a suit between the parents. Rather, the mother and the presumptive father were living together as husband and wife at the times the children were conceived and born, and their relationship never deteriorated. In addition, here there was no strong affirmative evidence of the type relied on by the courts in *Savruk* and *Johnson* that someone specific other than the husband had fathered the children. Moreover, in *Savruk* and *Johnson* the presumption of legitimacy was raised by the putative father as a defense in a paternity suit brought by the mother. In order to find the mother entitled to child support, the courts in *Savruk* and *Johnson* had to admit the mother's evidence. Here, admitting the mother's testimony and allowing it to rebut the presumption of legitimacy might lead to a finding of non-paternity and to a loss of benefits.

The ALJ's decision that appellant and the decedent were not married was not supported by substantial evidence, and we rule that the presumption of a common law marriage established by the facts that the applicant and the decedent considered themselves married, were known as married, and lived together as married, was not rebutted. That appellant and the decedent were married means that we must reach the question of whether the children are children entitled to benefits in this case. The Pennsylvania presumption that children born during a marriage are legitimate children of the marriage is a strong one, and the overwhelming showing necessary to rebut it was not made. Thus, there is no need for us to remand this case for further fact-finding.

For the foregoing reasons, the decision of the trial court will be reversed, and judgment entered for appellant.