602 A.2d 358

Violet SELM

v.

Robert ELLIOTT, Appellant.

Superior Court of Pennsylvania.

Argued Nov. 21, 1991.

Filed Jan. 28, 1992.

---

Gary A. Falatovich, Greensburg, for appellant.

Annaliese P. Masser, New Stanton, for appellee.

Before BECK, TAMILIA and HESTER, JJ.

HESTER, Judge:

█ Robert Elliott appeals from the order entered in the Court of Common Pleas of Westmoreland County on March 13, 1991, which directed the local domestic relations office to implement genetic testing so that the question of Jessica Selm's paternity may be resolved. As the facts of record overcame the presumption that Jessica Selm was a child of the marriage of appellee and Scott Selm, paternity is a relevant fact warranting the ordering of testing to establish paternity. Therefore, we affirm.

The procedural history of this case may be summarized as follows. On October 16, 1989, Violet Selm, appellee, filed a complaint for support alleging that Jessica Selm, a child born to her thirteen days previously, had been fathered by appellant. As appellee had been married to Scott Selm at the time of Jessica's conception and birth, the trial court scheduled an evidentiary hearing relating to the questions of both paternity and the presumption that a child born to a married woman is a child of the marriage. On March 13, 1991, upon the completion of the evidentiary hearing, the trial court found that Mrs. Selm had rebutted the presumption that Jessica was a child of her marriage. Consequently, it entered the challenged order. This timely appeal followed.

█ A trial court in a support action may require a putative father to submit to a blood test if the question of paternity is a relevant fact. *See Scott v. Mershon*, 394 Pa.Super. 411, 576 A.2d 67 (1990). Consequently, in order to determine the appropriateness of the trial court's order, we must decide whether the court correctly concluded that appellee rebutted the presumption that a child born to a married woman is a child of the marriage. In this regard, we note that appellant asserts that the evidence presented by appellee failed to overcome the presumption and that he demonstrated the applicability of the doctrine of estoppel to prevent appellee from denying Scott Selm's parentage of Jessica.

■ The presumption that a child conceived by and born to a married woman is the child of the mother's husband is one of the strongest presumptions in our law. *See Jones v. Trojak*, 402 Pa.Super. 61, 586 A.2d 397 (1990), petition for allowance of appeal granted, 527 Pa. 673, 594 A.2d 658 (1991). Consequently, the burden in overcoming that presumption is heavy.

> Traditionally, courts have permitted the presumption to be overcome only by evidence which clearly and convincingly establishes "non-access or that the husband was impotent or had no sexual intercourse with his wife at any time when it was possible in the course of nature for the child to have been begotten." *Commonwealth ex rel. Ermel v. Ermel*, 259 Pa.Super. 219, 221, 393 A.2d 796, 797 (1978), quoting *Cairgle v. American Radiator & Standard Sanitary Corp.*, 366 Pa. 249, 255, 77 A.2d 439, 442 (1951) (citations omitted).

*Id.*, 402 Pa.Super. at 66, 586 A.2d at 399. Keeping these principles in mind, we now consider the evidence presented at the hearing.

■ The evidence presented by appellee indicates that she met Scott Selm in 1986, while both were serving in the United States Air Force at an installation in Great Britain. In August of that year, shortly after their engagement, she was transferred to North Carolina. Although Scott continued to work in Great Britain, they were married on November 26, 1986, in the United States. Following the marriage, the two returned to their respective posts, Scott to England, and Violet to the United States.

In May or June, 1987, appellee visited Scott in England. During the course of this visit, she became pregnant with her first child, Nicholas. She therefore filed the requisite paperwork to effectuate her separation from the Air Force. Although appellee subsequently planned to rejoin her husband, she never received the requisite orders. Eventually, Scott informed her that he did not want her with him. Appellee testified that she had not seen nor spoken to her

husband since August, 1987. Notes of Testimony ("N.T."), 3/13/91, at 19.

Appellee testified that when she separated from the United States Air Force in August, 1987, her husband prepared the necessary paperwork to effect her medical insurance by CHAMPUS, the military's insurer for dependents of servicemen. *Id.*, at 30. The medical identification card she received was issued August 26, 1987, the day she separated from the Air Force, and expired on December 8, 1989, the date Scott was to be discharged. *Id.*, at 30–31, 46. Appellee also testified that she has been on public assistance since January, 1988. *Id.*, at 29. She stated that at the time of Nicholas's birth, February 15, 1988, her medical assistance card specified "that I had to show the CHAMPUS card first for all bills and then my medical assistance card." *Id.* at 32. Thus, CHAMPUS was the primary insurer, and medical assistance was the secondary insurer.

Nicholas was born at Forbes Regional Hospital in Monroeville, Pennsylvania, on February 15, 1988. Approximately twenty months later, Jessica was born at the same hospital. Appellee testified that she showed both the CHAMPUS and medical assistance cards when admitted to the hospital to give birth to her children, as both were in effect. She testified that at no time did she ever designate Scott Selm as the father of her second child, Jessica. To the contrary, appellee indicated that she named appellant as Jessica's father on the birth certificate.[1]

Appellant attempted to counter the evidence presented by appellee by introducing hospital records relating to both Nicholas's and Jessica's births. These records referred to Scott Selm as the husband of Violet Selm and indicated that he resided at the same address as his wife. In addition, appellant introduced a statement of account relating to Jessica's birth sent to Scott at appellee's address along with a copy of a payment voucher issued by Scott's insurance

---

1. The notes of testimony indicate that the trial court had a copy of the birth certificate before it, but it was never admitted into evidence, and is not in the record certified to us. N.T., 3/13/91, at 23–24.

company. Finally, appellant introduced testimony of a letter carrier, who stated that he had delivered a few pieces of mail addressed to Scott Selm at appellee's address.

Our review of the evidence reveals that the trial court correctly concluded that the evidence presented by appellee overcame the applicable presumption.[2] As demonstrated above, appellee presented evidence that she neither saw nor heard from her husband after he told her that he did not want her to join him in Great Britain. Although appellant attempted to contradict this evidence with the hospital records showing that CHAMPUS paid a portion of the costs associated with Jessica's birth, in conjunction with the testimony of a letter carrier that Scott Selm received mail at appellee's address, his effort was ineffectual. Appellee testified that at the time the CHAMPUS card was issued, she and her husband were not separated, and had plans to reunite in England following her separation from the air force. Moreover, medical assistance required that she submit the identification card from CHAMPUS, the primary insurer, along with the medical assistance card. This testimony clearly explained why Forbes Regional Hospital utilized Scott Selm's CHAMPUS card and designated him as the person responsible for the payment of the account.

Furthermore, the testimony of the letter carrier established only that Scott Selm had received "very few" pieces of mail at appellee's address over the course of the year. N.T., 3/13/91, at 61. In fact, appellant's presentation of the testimony of the letter carrier, in our view, reinforced appellee's testimony that Scott Selm did not reside with her. The mail carrier, in addition to establishing that Scott received very few pieces of mail, testified that the electric bill, the water bill, and the gas bill were addressed solely to appellee. *Id.*, at 63. In light of appellee's testimony, it is a fair inference of the evidence that the mail that did arrive

2. Our decision in this regard is unaffected by the fact that the evidence presented by Mrs. Selm consisted solely of her own testimony. It is clear that the testimony of a mother in a support matter may overcome the presumption in question. *See Commonwealth ex rel. Savruk v. Derby*, 235 Pa.Super. 560, 344 A.2d 624 (1975).

addressed to Scott Selm derived only from his status as the CHAMPUS insured.

We agree with the trial court that appellee adequately rebutted the presumption of legitimacy. Her testimony, which was found credible by the trial court and was unrebutted by appellant, established that she had not seen nor heard from Scott Selm since he told her, while she was pregnant with his child, that he did not want her to join him in England as planned. Moreover, appellee never held out her husband as the father of Jessica, and Scott had never acknowledged or supported the child. Consequently, unlike *Scott v. Mershon, supra,* there clearly is no extant family relationship between the child and the husband such as would preclude a challenge to the presumption. In light of these facts, it is clear that Jessica's needs would not be best served by maintaining the status quo. *Compare Scott v. Mershon, supra* (since action was for support and husband already fulfilled that obligation, there was no aggrieved party; thus the child's needs and interests were served by maintaining the status quo).

The following language, in a recently-filed decision of this court, is pertinent:

> Instantly, there has been no prior adjudication of paternity, and the record does not reflect that appellant has ever acted in a manner that would estop him from denying paternity of the children to be supported. There is no evidence that he ever accepted the children as his own or provided for their support.
>
> The presumption of paternity which arises from the marriage relationship *does not necessarily render the question of paternity irrelevant.* This presumption, although one of the strongest presumptions in the law, ... is a rebuttable presumption.

*Rodriguez v. Rodriguez,* 410 Pa.Super. 549, 600 A.2d 589 (1991) (Wieand, J., concurring, opinion at 592–593) (citations omitted; emphasis added).

■ Moreover, appellee is not estopped from denying Scott's paternity of Jessica. As is well-established, the

presumption of legitimacy may not be lightly turned aside, and "the conduct of the father (and/or the mother) may operate to estop any further inquiry." *Christianson v. Ely*, 390 Pa.Super. 398, 568 A.2d 961, 963 (1990). We further stated in that case that a mother cannot hold out her husband as the father of her child, and thereafter, upon separation, charge a different man with paternity. Such is not the case herein. The unrebutted testimony, found credible by the trial court, established that the mother and her husband had separated long before the child in question was conceived.

Accordingly, for the foregoing reasons, we affirm the order granting genetic testing.

Order affirmed.