654 A.2d 569

**Linda KOHLER**

v.

**David BLEEM**

v.

**Benjamin KOHLER, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 27, 1994.

Filed Feb. 6, 1995.

Gregory A. Henry, Bradford, for appellant.

Dennis Luttenauer, Kane, for appellee David Bleem.

Before CIRILLO, TAMILIA and HOFFMAN, JJ.

CIRILLO, Judge:

This is an appeal from an order of the Court of Common Pleas of McKean County. We reverse.

Appellant Benjamin S. Kohler was voluntarily sterilized by vasectomy in June of 1970. Mr. Kohler's semen was tested in August of 1970 and no spermatozoa were seen. Four years later, appellant married appellee Linda M. Kohler. Mrs. Kohler was aware of Mr. Kohler's vasectomy prior to the marriage.

Early in 1982 Mrs. Kohler determined that she was pregnant. She told her husband that the father of the child was a man from Buffalo; she made up a first name and told Mr. Kohler that she did not know exactly where he lived. Despite the circumstances, Mr. Kohler agreed to stay with Mrs. Kohler and help her financially as Mrs. Kohler was unemployed and her health insurance was maintained through Mr. Kohler's employer.

Mrs. Kohler's daughter, Leslie, was born in June of 1982. It was not until 1987 that Mr. Kohler learned that Leslie's father in fact was Mr. Bleem, a next-door neighbor and friend of the Kohlers. Mr. Bleem admitted his paternity to Mrs. Kohler and to Mrs. Kohler's sister; he did not, however, admit this to Mr. Kohler.

In the meantime, Mr. Kohler had contrived a story to his own mother that his vasectomy had been reversed. He did this, apparently, so as not to upset his mother. Thereafter, Mr. Kohler told his mother the truth, as he then understood it.

388

This was prior to Mr. Kohler's learning that Mr. Bleem was Leslie's father.

Mr. Bleem and Mrs. Kohler had been involved in an adulterous relationship for approximately four years prior to Leslie's birth; they continued the relationship after Leslie's birth. In 1988, one year after learning of the relationship between his wife and Mr. Bleem, Mr. Kohler left the marital home. Mr. Kohler testified that he could live with the idea that a stranger had fathered his wife's child, but he could not tolerate the idea of living next door to the man.

After the Kohlers separated, Mr. Bleem maintained a relationship with both Mrs. Kohler and Leslie. Leslie referred to Mr. Bleem as "Uncle Dave." Mr. Bleem had been in frequent contact with Leslie since her birth and he continued that relationship with her after the Kohlers' separation. Leslie continued to visit and spend the night at Mr. and Mrs. Bleem's home. Mr. Bleem bought presents for Leslie, gave Mrs. Kohler money for Leslie's benefit, and visited Leslie frequently.

On May 16, 1989, Mrs. Kohler filed a support action against Mr. Bleem; at this point, Mr. Bleem restricted his contact with Leslie and filed a complaint to join Mr. Kohler as an additional defendant. The trial court ordered blood tests for all parties involved. The tests revealed that Mr. Kohler was positively excluded as Leslie's father, and that the probability of Mr. Bleem's paternity was 98.72%.

In March of 1990, Mr. Kohler filed a complaint in divorce; he made no claim for custody, partial custody, or visitation of Leslie. The Kohlers were divorced on August 16, 1990.

On January 27, 1992, Mr. Bleem filed a motion for summary judgment averring that Mr. and Mrs. Kohler were both estopped from denying Mr. Kohler's paternity. The trial court denied Mr. Bleem's motion, stating:

... [Mr. Kohler] is sterile and cannot be the father of the child; ... the plaintiff has rebutted the presumption that the child born during the marriage is a child of the marriage by clear and convincing evidence ...

The matter proceeded to trial. Following trial, the court held against Mr. Kohler on the issue of paternity, stating the following ruling from the bench:

In this case it seems to me that the paternity by estoppel doctrine serves no significant purpose. It's undisputed, I find as a fact that it's undisputed that the defendant [Mr. Bleem] is in fact the father, that Leslie knows he is the father, that the marriage is no longer intact, that Mr. Kohler assumed the duties initially of parenthood through a misrepresentation and [sic] acquiesced in by Mr. Bleem. This raises a question in my mind about whether Mr. Kohler should be relieved of his obligation [of] support once the true facts are known and the marriage is broken. However, I find no precedent in the law for doing so and I feel that the present state of the law requires that the support obligation be placed on Mr. Kohler.

A final order of support was entered against Mr. Kohler on March 29, 1994. This appeal followed. Mr. Kohler raises the following issues for our review:

1. Whether the trial court erred in concluding that, under the facts of this case, it had no choice but to apply the doctrine of paternity by estoppel?

2. Whether precedent demands the application of the paternity by estoppel doctrine to a case involving a child born in wedlock, involving fraud, and where neither the best interests and welfare of the child nor public policy would be advanced by the invocation of the estoppel doctrine by the actual father or on behalf of the child?

3. Whether, under the facts of this case, the actual father was, because of his participation in fraud, estopped from invoking the doctrine of paternity by estoppel?

4. Whether the trial court erred in concluding that the appellant's acts of equitable estoppel [sic] were adequately established as a matter of law?

5. Whether the actual father lacked standing to invoke the doctrine of paternity by estoppel and was, himself, estopped to deny the paternity of the child?

■ One of the strongest presumptions in the law is that a child born to a married woman is a child of the marriage. *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380 (1990), *cert. denied*, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990); *Coco v. Vandergrift*, 416 Pa.Super. 444, 611 A.2d 299 (1992); *McCue v. McCue*, 413 Pa.Super. 71, 604 A.2d 738 (1992); *Donnelly v. Lindenmuth*, 409 Pa.Super. 341, 597 A.2d 1234 (1991). Historically, this presumption was referred to as the "presumption of legitimacy." *Dennison v. Page*, 29 Pa. 420 (1857); *Cairgle v. American Radiator & S.S. Corp.*, 366 Pa. 249, 77 A.2d 439 (1951); *Commonwealth ex rel. Goldman v. Goldman*, 199 Pa.Super. 274, 184 A.2d 351 (1962).

In *John M., supra*, 524 Pa. at 306, 571 A.2d 1380, the Pennsylvania Supreme Court reaffirmed the force of this presumption, characterizing it as "one of the strongest presumptions known to law." *Id.* at 312–13, 571 A.2d at 1383 (citing *Cairgle, supra*, 366 Pa. 249, 77 A.2d at 439); *see also Selm v. Elliott*, 411 Pa.Super. 602, 602 A.2d 358 (1992).

The "presumption of legitimacy" arose from the reluctance of the law to declare a child "illegitimate," because the status "illegitimate" historically subjected a child so labelled to significant legal and social discrimination.[1] [citations omitted]. In Pennsylvania, however, the General Assembly has eliminated the legal distinction (and discrimination) between "legitimate" and "illegitimate" children.[2]

---

1. Throughout history, illegitimate children were precluded from, among other legal rights, entering certain professions. The Book of Deuteronomy states:

 A bastard shall not enter into the congregation of the Lord; even to his tenth generation shall he not enter into the congregation of the Lord.

 Deut. 23:2.

 At common law, a child born out of wedlock, referred to as a bastard, was considered a nonperson and was not entitled to support from the father or inheritance from either parent. 1 W. Blackstone, *Commentaries* 459; *Davis v. Houston*, 2 Yeates 280 (1878).

2. The General Assembly has declared all children to be legitimate:

 All children shall be legitimate irrespective of the marital status of their parents, and in every case where children are born out of wedlock, they shall enjoy all the rights and privileges as if they had been born during the wedlock of their parents except as otherwise provided in Title 20 (relating to decedents, estates and fiduciaries).

*John M.*, 524 Pa. at 312 n. 2, 571 A.2d at 1383 n. 2. The Court also noted that since the legal distinction between "legitimate" and "illegitimate" children had been eliminated by statute, the phrase "presumption of legitimacy," had been rendered meaningless. The Court announced, therefore, that it would no longer "use the phrase 'presumption of legitimacy' to describe the 'presumption that child born to a married woman is a child of the marriage,' and therefore of the woman's husband." *Id.* at 312 n. 2, 571 A.2d at 1384 n. 2. Following our Supreme Court's lead, this court will refer to the presumption accordingly.

■ The strength of the presumption is grounded in the Commonwealth's interest in protecting the family, "the basic and foundational unit of society." *Id.* at 318, 571 A.2d at 1386 (citing *Commonwealth ex rel. O'Brien v. O'Brien,* 390 Pa. 551, 136 A.2d 451 (1957)). The presumption is, however, a rebuttable one. Traditionally, this presumption could be overcome only by proof that the husband did not have access to his wife during the period of possible conception, or by proof of the husband's impotency or sterility. *Id.* at 313–15, 571 A.2d at 1384. *See Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989); *Commonwealth ex rel. O'Brien v. O'Brien,* 390 Pa. 551, 136 A.2d 451 (1957); *Cairgle, supra,* 366 Pa. at 249, 77 A.2d 439; *Everett v. Anglemeyer,* 425 Pa.Super. 587, 625 A.2d 1252 (1993); *Burston v. Dodson,* 257 Pa.Super. 1, 390 A.2d 216 (1978).

> At common law a child born of a married woman was conclusively presumed to be legitimate unless her husband was not within the four seas which bounded the kingdom, but later it was held that the presumption of legitimacy could be overcome if the husband and wife lived at a distance from each other so that access was very improbable. This was the rule applied in Pennsylvania in 1814. *Commonwealth v. Shepherd,* 6 Binney 283, 286.

*Commonwealth ex rel. Goldman v. Goldman,* 199 Pa.Super.

23 Pa.C.S. § 5102(a).

274, 282–84, 184 A.2d 351, 355 (1962).[3] Evidence offered to rebut this presumption must be clear and convincing. *McCue v. McCue,* 413 Pa.Super. 71, 604 A.2d 738, *appeal denied,* 531 Pa. 655, 613 A.2d 560 (1992).[4]

Here, the trial court found that clear and convincing evidence had been presented with respect to Mr. Kohler's sterility so as to rebut the presumption that Leslie was a child of the marriage. Nonetheless, the trial court applied the doctrine of paternity by estoppel, finding no precedent for precluding application of the doctrine.

The principle that a husband is estopped from denying paternity where he has accepted his wife's child and held it out as his own emerged in *Goldman, supra,* 199 Pa.Super. at 274, 184 A.2d 351. There, the parties, husband and wife, had three children born of the marriage. A divorce action was pending and wife sought support from husband for the three children. Husband filed a petition denying paternity of the two younger children and requesting that the court order blood tests. The trial court granted husband's request and wife appealed. In discussing the applicability of the Uniform Act on Blood Tests

**3.** At common law, neither the husband nor the wife was permitted to "bastardize" his or her child, and thus neither could testify as to nonaccess. This rule originated in dictum advanced by Lord Mansfield in *Goodright v. Moss,* 2 Cowp. 591 (1771), and was followed in the Commonwealth for some time. *See Commonwealth ex rel. Goldman v. Goldman, supra,* and *Commonwealth v. Carrasquilla,* 191 Pa.Super. 14, 155 A.2d 473 (1959). The rule has since been abandoned and both husband and wife are competent to testify to this issue. *See McCue v. McCue,* 413 Pa.Super. 71, 604 A.2d 738, *appeal denied,* 531 Pa. 655, 613 A.2d 560 (1992); *Commonwealth ex rel. Savruk v. Derby,* 235 Pa.Super. 560, 344 A.2d 624 (1975).

**4.** Additionally, the presumption that a child born to a married woman is a child of the marriage is overcome if blood tests show that the woman's husband is not the father of the child. *See* 23 Pa.C.S.A. § 5104(g). However, this statute is somewhat anomalous in light of the Pennsylvania Supreme Court's recent announcement in *Jones v. Trojak,* 535 Pa. 95, 634 A.2d 201 (1993), that a court "may order blood tests to determine paternity only when the presumption of paternity has been overcome." *Id.* at 105, 634 A.2d at 206, (citing *John M. v. Paula T.,* 524 Pa. 306, 571 A.2d 1380, *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990)).

to Determine Paternity,[5] this court stated:

> We recognize that there is something disgusting about a husband who, moved by bitterness toward his wife, suddenly questions the legitimacy of her child whom he has been accepting and recognizing as his own. Except in rare situations the rules of evidence have heretofore prevented his doing this. By providing a new method to overcome the presumption of legitimacy, the legislature has opened avenues to a husband to question the paternity of his wife's children which never before were available to him. We think that this right to question the paternity is not unlimited. Where the husband has accepted his wife's child and held it out as his own over a period of time, he is estopped from denying paternity. 31 C.J.S. Estoppel § 110.

*Goldman*, 199 Pa.Super. at 282–83, 184 A.2d at 355 (emphasis added).[6]

In *Goldman*, the husband denied paternity of the two younger children. Of these two, the first was born before the parties separated; the youngest child was conceived and born after the parties had separated. The court affirmed the trial court's order granting husband's request for blood tests pertaining to the paternity of both children. The court stated: "It does not appear from the record before us that the defendant is guilty of laches, nor of such conduct as would estop him from denying paternity.... He, therefore, ... is entitled to an order requiring blood grouping tests of the parties involved." *Id.*

One year later, in *Commonwealth ex rel. Weston v. Weston*, 201 Pa.Super. 554, 193 A.2d 782 (1963), this court held that

5. July 13, 1961, P.L. 587, 28 P.S. § 307.1 *et seq.*, 1976, July 9, P.L. 586, No. 142, § 2, 42 Pa.C.S.A. §§ 6131–6137, December 19, 1990, P.L. 1240, No. 206, § 2, effective in 60 days, 23 Pa.C.S.A. § 5104.

6. Judge Montgomery filed a dissenting opinion, in which Judge Watkins joined. In his dissent, Judge Montgomery opined that he would not find the Uniform Act on Blood Tests to Determine Paternity applicable to challenge the paternity of a child born during wedlock. Judge Montgomery stated: "Families may live together for many years before this charge [of illegitimacy] is asserted. This is clearly against all reason, common sense, and morals, in the light of the sanctity which we have given to the family unit in our way of life." *Goldman*, 199 Pa.Super. at 288, 184 A.2d at 358 (Montgomery, J., dissenting).

where the husband had lived with his wife during the time that two children were conceived, husband was not entitled to a request for blood tests. In *Weston,* husband lived with his wife for several years after the children were born, accepted the children as his own during that time, and did not request blood tests until after the parties had separated and wife filed a petition for support. *Id.* at 556–57, 193 A.2d at 783. *See also Commonwealth ex rel. Hall v. Hall,* 215 Pa.Super. 24, 257 A.2d 269 (1969).

The doctrine of paternity by estoppel has also been applied in cases involving children born out of wedlock. *See, e.g., Jefferson v. Perry,* 432 Pa.Super. 651, 639 A.2d 830 (1994); *In the Matter of Montenegro,* 365 Pa.Super. 98, 528 A.2d 1381 (1987). Principles of estoppel are peculiarly suited to cases where a child is conceived out of wedlock, because in those cases, no presumptions regarding paternity apply. *See Jefferson, supra,* 432 Pa.Super. at 651, 639 A.2d 830; *cf. Everett v. Anglemeyer,* 425 Pa.Super. 587, 625 A.2d 1252 (1993). *See also* 23 Pa.C.S.A. § 5102(b)(2).[7]

 The interaction of the doctrine of paternity by estoppel, the presumption that a child born to a married woman is a child of the marriage, and the allegations of fraud in this case must first be explored before we can determine whether Mr. Bleem may invoke estoppel principles. First, if the matter involves a child born out of wedlock, no presumptions apply and the determination will turn on application of estoppel principles to the particular facts of the case. *See In the Matter of Naja Green,* 437 Pa.Super. 606, 650 A.2d 1072 (1994); *Jefferson, supra,* 432 Pa.Super. at 651, 639 A.2d 830;

7. The General Assembly has codified the principles of paternity by estoppel in cases involving children born out of wedlock. *See* 23 Pa.C.S.A. § 5102(b)(2). The relevant section provides:

(b) For purposes of prescribed benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:

\* \* \* \* \* \*

(2) If during the lifetime of the child, the father openly holds out the child to be his and receives the child into his home, or openly holds out the child to be his and provides support for the child which shall be determined by clear and convincing evidence.

23 Pa.C.S.A. § 5102(b).

*Everett, supra,* 425 Pa.Super. at 587, 625 A.2d 1252; *see also* 23 Pa.C.S.A. § 5102(b). Second, if the matter involves a child born during wedlock, the presumption automatically applies but may be rebutted by clear and convincing evidence of non-access or impotency/sterility. *Goldman, supra,* 199 Pa.Super. at 274, 184 A.2d 351; *Everett, supra,* 425 Pa.Super. at 587, 625 A.2d 1252; *McCue, supra,* 413 Pa.Super. at 71, 604 A.2d 738. Additionally, application of estoppel principles may be employed to determine whether the presumption may be rebutted. If estoppel principles are applicable, the presumption will generally prevail. For example, in *Jones v. Trojak, supra,* 535 Pa. at 95, 634 A.2d 201, appellee Kathryn Jones filed a paternity action against appellant Joseph Trojak, alleging that Trojak was the father of Katie Jones. Katie was born while Mrs. Jones was still married to and living with William Jones. Over Trojak's objection, the trial court ordered blood tests. The tests indicated to a 99.9% probability that Trojak was Katie's biological father. Thereafter, the trial court entered an order allowing the blood test results to be considered in a second trial. Trojak appealed this order.

While the appeal was pending before this court, the trial court entered an order adjudicating Trojak as the child's natural father. This court reversed and remanded and the Pennsylvania Supreme Court accepted allocatur. The Supreme Court affirmed this court's order. *Jones,* 535 Pa. at 106–07, 634 A.2d at 207. The Supreme Court held that a court order requiring blood tests was subject to interlocutory review. The Court also held that there must first be a determination that the child born to a married couple is not the child of the marriage before blood tests can be ordered for a third party, and that in this case the presumption had been overcome.[8] The trial court, therefore, had properly ordered Trojak to submit to a blood test. *Jones,* 535 Pa. at 100–07, 634 A.2d at 204–207. The Court stated:

8. There was evidence that Trojak admitted Mrs. Jones told him that she was not having sexual relations with her husband at or around the time Katie was conceived; that both Trojak and Mrs. Jones admitted to sexual relations for one to two years prior to conception and during the time of conception; that Trojak made weekly support payments for approximately two years; and, that Trojak paid other expenses "for Katie." *Jones,* 535 Pa. at 104 n. 7, 634 A.2d at 206 n. 7.

We adopt the approach taken by the Superior Court in *Christianson v. Ely,* [390 Pa.Super. 398, 568 A.2d 961 (1990),] which mandates that before an order for a blood test is appropriate to determine paternity the actual relationship of the presumptive father and natural mother must be determined. 390 Pa.Super. 398, 409; 568 A.2d 961, 966. . . .

*Jones,* 535 Pa. at 104–05, 634 A.2d at 206. The exact language used in *Christianson* reads:

This case must, therefore, be remanded for further evidence to be presented to the court as to the actual relationship of the presumptive father and natural mother and as to whether or not the doctrine of estoppel applies. Only in the event that estoppel does not apply and it appears the father did not accept the child to be his own by holding it out and/or supporting the child, will the mother be permitted to proceed with her claim against [Ely] which may be aided by use of the blood test. **If there is substantial evidence to the effect that the father has denied paternity and refused to accept responsibility from the time he was reasonably aware of his non-paternity, then the rule in *Goldman* would apply and permit the taking of the blood test of [Ely]. Otherwise the presumption of legitimacy has not been rebutted and estoppel must be invoked to prevent the blood test with the issue of paternity settled in favor of the presumptive father.**

*Christianson,* 390 Pa.Super. at 409–10, 568 A.2d at 966 (emphasis added).

■ It appears clear from the case law on these issues that estoppel principles will automatically be invoked (when operative under the facts of the case) if clear and convincing evidence has been offered to rebut the presumption that a child born during coverture is a child of the marriage. *Jones, supra,* 535 Pa. at 95, 634 A.2d 201; *Everett, supra,* 425 Pa.Super. at 587, 625 A.2d 1252; *Gonzalez, supra,* 245 Pa.Super. at 307, 369 A.2d 416; *Weston, supra,* 201 Pa.Super. at 554, 193 A.2d 782. In the more common fact situations,

application of estoppel principles results in a finding that the presumption has not been rebutted.

■ What remains uncertain in the law, however, is the applicability of the equitable doctrine of estoppel where (1) clear and convincing evidence has been offered to rebut the presumption; (2) the party seeking to invoke estoppel in his or her favor is guilty of fraud or misrepresentation; *and* (3) there is no intact family. What is of significant import in our determination in this instance is this last factor. *Cf. In the Matter of Naja Green, supra,* 437 Pa.Super. at 606, 650 A.2d 1072 ("Public policy dictates that the parent/child bond be nurtured. We are bound to preserve that relationship where it exists."). We take note of the suggestion that the presumption "becomes easier to rebut when the marriage is no longer intact." Wilder, *Pa. Family Law Prac. and Proc.* (3rd ed.), § 27–4. *See, e.g., Jones, supra,* 535 Pa. at 95, 634 A.2d 201; *Selm, supra,* 411 Pa.Super. at 602, 602 A.2d 358. The presumption that a child born during a marriage is a child of the marriage and the doctrine of paternity by estoppel grew out of a concern for the protection of the family unit; where that unit no longer exists, it defies both logic and fairness to apply equitable principles to perpetuate a pretense. In this case, application of estoppel would punish the party that sought to do what was righteous and reward that party that has perpetrated a fraud. *See B.O. v. C.O.,* 404 Pa.Super. 127, 130–32, 590 A.2d 313, 315 (1991) ("When an allegation of fraud is injected in a case, the whole tone and tenor of the matter changes. It opens the door to overturning settled issues and policies of the law.").[9] Our Supreme Court's language in *Jones, supra,* 535 Pa. at 95, 634 A.2d 201, distinguishing the facts in *Jones* and those in *John M.,* is instructive:

> [In *John M.*] there is in short, a family involved ... [a] woman and a man who have married and lived together as

9. Although Mr. Bleem contends that he was not a party to Mrs. Kohler's misrepresentation to her husband that the father of the child was a man from Buffalo, Mr. Bleem acknowledged the fraud, admitted an intimate relationship with Mrs. Kohler during the time of conception, and was aware of Mrs. Kohler's confidence that he was the child's father. He also admitted his paternity to Mrs. Kohler and Mrs. Kohler's sister. Mr. Bleem did nothing to dispel the misrepresentation upon which Mr. Kohler relied. *See Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 108, 464 A.2d 1243, 1252 (1983).

husband and wife, giving birth to and raising four children.... In [*Jones* ], however, we ... are convinced that the facts indicate that the presumptive father and mother repudiated their marriage vows long ago. Additionally, we have evidence that the presumptive father did not accept the child as his own. The circumstances before us, as found by the trial court, are that the presumptive father has never financially or emotionally supported Katie. Moreover, the trial court found that during the time Katie was conceived, [Mrs.] Jones was not sexually involved with the presumptive father because he was impotent, and this testimony was not rebutted by either the presumptive father or the putative father. **Thus, we agree with the Superior Court that there being no intact family considerations present, a determination regarding Trojak's paternity is necessary to resolve the child support claim made by Jones.**

*Jones,* 535 Pa. at 106–07, 634 A.2d at 207 (emphasis added).[10]

█ In this case, there are no intact family considerations. The presumption that Leslie is a child of the marriage has been overcome by clear and convincing evidence of Mr. Kohler's vasectomy and a subsequent test which revealed no spermatozoa in his semen. *See Goldman, supra,* 199 Pa.Super. at 374, 184 A.2d 351; *see also John M., supra,* 524 Pa. at 306, 571 A.2d 1380 (presumption can be overcome only by proof of facts establishing nonaccess or impotency). Moreover, Leslie has established a relationship with Mr. Bleem and apparently has not been traumatized by the knowledge that he is in fact her father. Blood tests, which were conclusive as to Mr. Bleem's paternity, were, therefore, a relevant fact. *See John M., supra; cf. Scott v. Mershon,* 394 Pa.Super. 411, 576 A.2d 67 (1990).

**10.** In the instant case, the blood tests have already been performed and this court is not aware of a previous appeal for review of that interlocutory order. This does not, however, preclude consideration or application of equitable estoppel principles. The estoppel doctrine is equally applicable in cases arising in the context of requests for permission to take blood tests as it is in cases such this, where blood tests have already been taken. *See Commonwealth ex rel. Gonzalez v. Andreas,* 245 Pa.Super. 307, 310–12, 369 A.2d 416, 418 (1976).

The trial court in this case, acknowledging that clear and convincing evidence of Mr. Kohler's sterility had rebutted the presumption, and acknowledging Leslie's true paternity, believed it was compelled to apply the estoppel doctrine due to Mr. Kohler's actions during the first few years of Leslie's life. Ostensibly, this comported with the law of the Commonwealth.

What the trial court neglected to consider, however, is the role of estoppel principles in a factual situation such as this, that is, one involving fraud and misrepresentation and the absence of an intact family. The confusion in this case arises from the fact that Mr. Kohler did accept Leslie as his daughter, knowing that she was not his child. This brings into play the paternity by estoppel doctrine. Mr. Kohler, however, was operating under the misrepresentation that an "unknown" man had fathered the child. But for this fact, Mr. Kohler indicated that he would have left his wife immediately. In fact, Mr. Kohler did so when he was told that Mr. Bleem was Leslie's natural father.

In *Gulla v. Fitzpatrick*, 408 Pa.Super. 269, 596 A.2d 851 (1991), this court explained that the doctrine of equitable estoppel is aimed at "achieving fairness between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child." *Id.* at 279, 596 A.2d at 856. "Every such case must be decided after a close analysis of all of the facts and circumstances[.]" *Id.* The *Gulla* court emphasized that the proper focus is on the relationship between father and child. *Id.*

Despite the subterfuge on the part of Mrs. Kohler and Mr. Bleem, both were aware of the child's true paternity. Although for six years Mr. Kohler was unaware that Mr. Bleem was Leslie's father, he knew that he had not fathered the child. Furthermore, when he learned of the child's true parentage, Mr. Kohler left the marital home. *Compare Jones, supra*, 535 Pa. 95, 634 A.2d 201 (presumption that child was a child of the marriage was overcome; undisputed evidence indicated that during time of conception mother was not sexually involved with presumptive father, and presumptive father did not accept child as his own since he had never financially or emotionally supported the child) *with Common-*

*wealth ex rel. Hall v. Hall,* 215 Pa.Super. 24, 257 A.2d 269 (1969) (where child was conceived and born while husband and wife were living together and where, upon separation, husband acknowledged the child as his daughter, provided for her future support, and made extensive arrangements for visitation, husband was estopped from denying paternity). Additionally, as stated above, the record supports a finding that the child was not adversely affected upon learning that Mr. Bleem was her father. In fact, the record indicates that Leslie was pleased to learn that Mr. Bleem was her father and referred to him as "my dad." *Jones, supra,* 535 Pa. at 95, 634 A.2d 201; *Gulla, supra,* 408 Pa.Super. at 269, 596 A.2d 851. *Cf. Hall,* 215 Pa.Super. at 34–35, 257 A.2d at 274 (Hoffman, J., dissenting) ("Proof of the child's paternity, which is the basis for a support order, is not necessarily made more difficult by the passage of time during which the husband lived at home.").

We conclude, therefore, that the presumption that Mr. Kohler was Leslie's father was rebutted by clear and convincing evidence and that, under these circumstances, Mr. Bleem is precluded from utilizing equitable principles. Application of estoppel is inappropriate in this case. The trial court, therefore, erred in allowing Mr. Bleem to invoke the doctrine of estoppel to preclude Mr. Kohler's denial of paternity.

Reversed.

TAMILIA, J., files a Dissenting Opinion.

TAMILIA, Judge, dissenting:

I respectfully dissent. The long and learned Opinion by the majority ignores the simple principle of established law that estoppel applies in cases such as this. The majority would introduce a variant of the discovery rule by alleging the legal father in this case, Mr. Kohler, may renounce paternity because the biological father is "A" instead of "B". The estoppel doctrine protects both the intact family, which this was during and many years following the birth of the child, and the child, who is now without a legal father by pronouncement of this Court.

There are several means by which the law establishes paternity, irrespective of biological conception. Examples are

adoption, acknowledgement, marriage to the mother and acceptance of the child, presumption of legitimacy by marriage during conception and, as here, by estoppel despite knowledge of inability to conceive and that the husband is not the father of the child. The majority introduces a new variant which destabilizes what has been determined by policy to be an area which should be protected. The trial court is correct in its decision and there is no statute or case law which justifies reversal.

The starting point of this case is presumption of legitimacy (now referred to as presumption that child born to a married woman is the child of the woman's husband). *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380 (1990), *cert. denied*, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). This presumption is rebuttable by showing non-access or inability on the part of the husband to conceive. *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). However, as here, when the parties, at the time of conception, knew the husband could not be the father, rebutting criteria are not implicated and are irrelevant to the consideration of paternity as a legal matter. It has long been the law that when a husband is aware he is not the father of a child born during marriage, but takes on the role of father and remains in the marriage in that role, a later decision to reject his paternity will not be recognized by the courts and he is estopped from denying paternity. *John M., supra*, 524 Pa. at 306, 571 A.2d 1380. In other words, even if, in fact, the presumption is rebuttable for any reason, under principles wherein estoppel applies, the presumption may not be rebutted. A similar rule applies to a putative father who marries the mother and legitimatizes the child. *Matter of Montenegro*, 365 Pa.Super. 98, 528 A.2d 1381 (1987).

The results of a blood test proving the putative father not to be the biological father are not relevant because the husband is estopped from denying paternity. *Christianson v. Ely*, 390 Pa.Super. 398, 568 A.2d 961 (1990). In *Seger v. Seger*, 377 Pa.Super. 391, 547 A.2d 424 (1988), this Court held that a mother was estopped from denying the husband's paternity, after separation, when she permitted him to maintain the child

and assume parental duties during the period the family was intact. The law treats both parents equally when the issue is rebuttal evidence and estoppel thereof.

Two elements in *Seger* are similar to the present case. The parent assumed parental duties during the marriage and there was a rejection or repudiation of paternity by one of the parties upon separation. Also, in each case there was concealment of the true nature of the paternity. In *Seger*, we stated: "It has been stated in numerous cases that a father is estopped from denying paternity by long delay in raising the issue at all (assuming he was aware of non-paternity) and by his acceptance and support of the child during that time." *Id.* at 397, 547 A.2d at 427 (citations omitted). In *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201 (1993), our Supreme Court held the presumptive father will not be estopped from challenging paternity when he failed to accept the child as his own by holding it out as such and/or supporting the child. Estoppel does apply, however, when the father has accepted the child and treated him as his own and he may not, upon separation, reject paternity and demand a blood test to rebut the presumption. This view was adopted from *Christianson v. Ely*, 390 Pa.Super. 398, 568 A.2d 961 (1990), where this Court held that a mother could not force a putative father to submit to a blood test to rebut paternity of a child conceived and born while the mother was married to and living with the husband absent proof that the husband had denied paternity and refused responsibility from the time he was reasonably aware of non-paternity. In this case, the husband was absolutely aware of non-paternity from the time of pregnancy and only seven years later, after separation, did he reject responsibility. No clearer case for estoppel according to legal precedent can be established. The fact that the appellant became aware of the true identity of the alleged father is irrelevant to the issue of estoppel. It is knowledge of and acceptance of non-paternity that creates the estoppel; lack of knowledge as to the true identity of the putative father is irrelevant. Husband cannot choose when to repudiate his prior acceptance of paternity nor can he make such a repudiation upon a subsequent determina-

tion of the identity of the biological father. The doctrine of estoppel as to the issue of paternity cannot be so qualified as to give it questionable validity and applicability based on an unknown and immaterial variant. Should this exception be engrafted upon the principle of estoppel, it is not difficult to visualize other post-estoppel renunciations based on race or ethnic background of the biological father, possession of a genetic defect giving rise to subsequent illness and medical expenses, or any of a myriad of other subjectively conceived reasons. The essence of the doctrine is knowledge of non-paternity and acceptance of the status of parent-child relationship. After six years in which the family remained intact and the child was nurtured in an intact family setting with future benefits to the child to be derived from the continuing status, the knowledgeable adults now may not disturb that relationship to the possible detriment of the innocent child. This finding and that of *Christianson, supra,* 408 Pa.Super. at 269, 596 A.2d 851, follow in a consistent, straight line from *Commonwealth ex rel. Goldman v. Goldman,* 199 Pa.Super. 274, 184 A.2d 351 (1962) (estoppel applies to grant of blood test where child born during coverture is accepted by defendant as his own), and *Commonwealth v. Weston,* 201 Pa.Super. 554, 193 A.2d 782 (1963) (when a child is born during coverture and father has accepted the child prior to filing a petition for blood test, he should be refused a petition for blood test). The majority quotes at length from the cases involving estoppel and presumption of legitimacy but attempts to circumvent the public policy upon which those cases are based. The spurious issue of fraud as to the identity of the actual father of the child is not a factor which can undermine the policy decision that a child born in an intact family, with knowledge by the husband that the biological father is another person, followed by acceptance by the husband, must be deemed the legitimate child of that family. That policy decision is a statement that society values more highly the preservation of intact families and that children shall be legitimate than it does the privacy and other interests which might subsequently be alleged by the parents. The legislature established several means by which a child may be legitimatized, aside from birth during coverture. Paternity may be acknowledged in writing and by filing a

document with the Department of Health, pursuant to 23 Pa.C.S. § 5103, **Acknowledgement and claim of paternity.** More to the point, "paternity by estoppel" provisions have been codified by the General Assembly in 23 Pa.C.S. § 5102 as follows:

### § 5102. Children declared to be legitimate

(a) **General rule.**—All children shall be legitimate. irrespective of the marital status of their parents, and, in every case where children are born out of wedlock, they shall enjoy all the rights and privileges as if they had been born during the wedlock of their parents except as otherwise provided in Title 20 (relating to decedents, estates and fiduciaries).

(b) **Determination of paternity.**—For purposes of prescribing benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:

(1) If the parents of a child born out of wedlock have married each other.

(2) If, *during the lifetime of the child, it is determined by clear and convincing evidence that the father openly holds out the child to be his and either receives the child into his home or provides support for the child.*

(3) If there is clear and convincing evidence that the man was the father of the child, which may include a prior court determination of paternity.

(Emphasis added.)

There is absolutely no question that the child in this case was accepted and held out by appellant as his own, and without qualification obtains the statutory protection of legitimacy established by the legislature, pursuant to section 5102(b)(2). It is undeniable that public policy favors legitimacy and the actions of the parents, even if misguided, which fulfill the statutory requirements establishing the child's legitimacy and the parents' obligation may not later be repudiated because of a mistake of fact or even a misrepresentation that does not go to the essentials of the undertaking. Here, the

essential ingredient was the assumption of the obligation of paternity with knowledge that the appellant was not and could not be the child's parent. The child became the true beneficiary of this acceptance and the law imposes a continuing irrevocable obligation (short of termination of parental rights) on the parent assuming the obligation.

In *John M., supra,* 524 Pa. at 306, 571 A.2d 1380, the Pennsylvania Supreme Court, in reviewing the above statutory provisions, stated, in adopting language from *Montenegro, supra,* 365 Pa.Super. at 98, 528 A.2d 1381, "since the requirements of the law had been met to establish paternity, the father was estopped from denying paternity five years later." *John M., supra* at 571 A.2d at 1387.

A fair reading of the cases establishing estoppel leads to the conclusion that the presumption must be rebutted at or near the time of the child's birth. The concept of an intact family which the law seeks to protect is the family as it exists at the time of conception or birth of the child (not at time of separation), and if the presumption is not rebutted at that time or the duty is legally assumed at that time, estoppel applies. The father is estopped from rebutting the presumption for any reason, whether it be because of the father's sterility, nonaccess, fraud as to identity of the biological father or any other proposed rationale. The presumption by reason of estoppel becomes irrebuttable even as to an alleged fraud as to identity of the true biological father. By its very nature, contested issues of paternity invariably involve secretiveness, denial, misrepresentation and fraud. To open the door to overcome the estoppel doctrine because of the kind of fraud alleged in this case would be to destabilize the public policy so laboriously developed over centuries down to the present time. As a matter of law and public policy, this type of fraud is vitiated by the acknowledgement of paternal responsibility. The variables of human nature, emotion and relationship are such that it is impossible to say six or seven years after acceptance, and when the relationship had soured, what would have been the appellant's reaction had he known the true identity of the biological father. With the wide range of activities engaged in today via artificial insemination, in vitro

fertilization, surrogate parentage, and almost inconceivable matches resulting in children to parents who cannot conceive together, even this relationship might have been accepted by a husband who desired to preserve a marriage with a wife who desired to have a child which appellant could not produce. The state of confusion that exists in marital and nonmarital relationships in today's society requires that the fullest protection possible be provided to the children created through these relationships.

I believe the trial court must be affirmed.