## Zakeosian v. Zakeosian

C.P. of Bucks County, no. A06-95-60123-S.

*Matthew D. Weintraub,* for plaintiff.
*Eric J. Cox,* for defendant.

RUFE, J., *J.,* February 27, 1996—This opinion is written pursuant to an appeal by Michael A. Zakeosian from our order of December 13, 1995 denying his petition to vacate an existing support order entered by this court on March 21, 1995.

On January 10, 1995, Laura Zakeosian, the former spouse of Michael A. Zakeosian, filed a petition for support of one child, Chelsea Ann. At a hearing before the undersigned on March 21, 1995, an order was entered requiring defendant to pay $10 per week for support and to provide health care coverage for Chelsea. Defendant raised the issue of paternity at that time.

The docket reflects that defendant filed a petition seeking reconsideration of the support order and requesting that the parties be ordered to submit to blood testing. A rule returnable date of May 8, 1995 was issued. The docket further reflects that a motion to make rule absolute was filed by defendant on June 6, 1995. As part of the motion, defendant averred that no response to the rule to show cause had been filed by plaintiff. Relying upon the averments as pleaded in defendant's motion, the court made the rule absolute and granted defendant's request for blood testing. Subsequently, at a contempt hearing[1] held before the court on November 27, 1995, it was learned that plaintiff,

---

1. Plaintiff had filed a request for a hearing on the basis that defendant had not been providing medical coverage for Chelsea as required by the support order.

acting pro se, had filed a response to both the motion for reconsideration and to the petition for blood testing but had failed to serve them upon defendant. Recognizing that the rule absolute was entered in error, the court proceeded to hear evidence concerning the issue of paternity.

The evidence offered at the hearing established that Michael and Laura Zakeosian were married on December 7, 1985 and divorced on June 24, 1991. Three children were born during the course of the marriage, Corey, age 9, was born on February 27, 1986, Craig, age 8, was born on May 17, 1987, and Chelsea, age 6, was born on February 10, 1989. Plaintiff and defendant both testified that they were living together on May 3, 1988, the approximate date of Chelsea's conception. In early June of 1988, plaintiff moved out of the marital home. She testified that she had been involved in another relationship for some three months prior to moving out. Upon learning that she was pregnant, plaintiff contacted defendant and informed him of the pregnancy. Defendant testified that although he had some doubts as to whether the child was his, he agreed to try and make the marriage work. Plaintiff moved back into the marital home in August of 1988.

The couple lived together during the entire pregnancy and for several months thereafter until they separated in August of 1989. Plaintiff maintained physical custody of Chelsea, while the two boys resided with defendant. Since plaintiff and defendant maintained an amicable relationship with one another, visitation was never formalized by court order. Defendant saw Chelsea every other weekend, on average, until the time of the divorce in 1991. After the divorce, defendant made requests to visit with Chelsea and she would spend approximately one weekend a month with defendant and her brothers.

Defendant conceded that Chelsea called him, "Dad" and that he held himself out to be Chelsea's father to both friends and family. Chelsea referred to defendant's parents as "Granny and Pop-Pop." Defendant was listed as the father of Chelsea on her birth certificate. Defendant also stated that he celebrated birthdays with Chelsea and that the two exchanged Christmas presents. Likewise, Chelsea was present in two family photographs, one with defendant and her two brothers, and another with defendant's current wife and her children. The first was taken in 1992 and the second in 1993.

Based upon the testimony produced at the hearing on November 27, 1995, we refused to vacate the original support order entered on March 21, 1995. The decision was based upon a finding that defendant had not overcome the presumption of legitimacy and, additionally, that he was estopped from disputing paternity by his conduct both prior to and after Chelsea's birth. Defendant now appeals our order contending that it was error for the court not to have considered the results of the blood test eliminating him as Chelsea's biological father.

The presumption that a child born to a married woman is a child of the marriage is one of the strongest presumptions known to the law. *John M. v. Paula T.,* 524 Pa. 306, 571 A.2d 1380 (1990), *cert. denied,* 498 U.S. 850 (1990); *McCue v. McCue,* 413 Pa. Super. 71, 604 A.2d 738 (1992); *Kohler v. Bleem,* 439 Pa. Super. 385, 654 A.2d 569 (1995). While the strength of the presumption stems from society's interest in protecting the best interests of children, the presumption is a rebuttable one. *Kohler, supra* at 391, 654 A.2d at 572. The presumption of legitimacy can be overcome by clear and convincing evidence establishing that the husband was impotent or did not have sexual access to

the wife at the time that the child was conceived. *Freedman v. McCandless,* 539 Pa. 584, 591, 654 A.2d 529, 532 (1995).

In the instant matter, because the child was born during the course of the marriage, the presumption of legitimacy applied. Thus, Mr. Zakeosian could only have challenged the presumption by presenting clear and convincing evidence that he did not have sexual access to plaintiff at the time of conception or that he was physically incapable of conceiving a child. Mr. Zakeosian's testimony did not support either of those situations. Rather, both plaintiff and defendant testified that the parties were still living together at the time of conception. Having failed to overcome the presumption, the blood tests were irrelevant to a determination of paternity and therefore, were not considered by this court.

Additionally, "application of estoppel principles may be employed to determine whether the presumption may be rebutted. If the estoppel principles are applicable, the presumption will generally prevail." *Kohler, supra* at 395, 654 A.2d at 574. The Pennsylvania Supreme Court revisited the concept of estoppel in *Freedman,* stating:

"Estoppel in paternity actions is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father." *Id.* at 591, 654 A.2d at 532-533.

Estoppel cases have determined that when the doctrine applies, blood tests may well be irrelevant because

the law will not allow a person in such a circumstance to challenge the role which he or she has previously accepted. *John M., supra* at 318, 571 A.2d at 1386; *Jones v. Trojak,* 535 Pa. 95, 105, 634 A.2d 201, 206 (1993).

In the case at hand, the evidence adduced during the hearing decidedly established that defendant held Chelsea out to be his own child both prior to and after the parties' separation and divorce. Chelsea Zakeosian was born on February 10, 1989 and Michael Zakeosian is listed as her father on the birth certificate. Defendant assisted in the delivery of the baby and took the child into the marital home after her birth. Defendant provided both financial and health care support for the baby and continued to do so until the divorce in 1991. Michael Zakeosian is the only father known to Chelsea in the entire six years of her life and he always referred to Chelsea as his daughter to family, friends and co-workers. In light of these facts, we determined that the requirements of the law to establish paternity, while not in the biological sense, had been satisfied. Defendant was estopped from challenging paternity and therefore, the results of the blood test were both inadmissible and irrelevant in resolving the issue of paternity. The language of the Superior Court in *Scott v. Mershon,* 394 Pa. Super. 411, 419, 576 A.2d 67, 71 (1990) is instructive:

"Therefore, both adherence to the presumption and application of estoppel lead to the same point: the blood test is no longer necessary, whatever the result may be, because legal paternity has been established, and biological paternity is simply no longer relevant."

Defendant contends that this court erred in hearing evidence concerning paternity since the court was bound

by the doctrine of collateral estoppel. Specifically, defendant contends that we considered the entire issue of paternity when we granted the order of June 13, 1995, allowing the blood testing and plaintiff should not have been afforded another opportunity to present her objections. We disagree.

First, it is clear from a review of the docket entries that the June 13, 1995 order granting the blood tests was done by rule absolute. Therefore, the order granting the blood tests was not the result of a thorough litigation or extensive review. Rather, it was the result of a procedural rule designed to efficiently manage judicial time and resources. Moreover, the rule was granted upon the erroneous assertion that plaintiff had never filed a response to the petition. We could not, in good conscience, allow the procedural aspects of the practice of law to take precedence over the best interest of the child. Upon learning of the erroneously issued order, the court proceeded to allow each party a full and fair opportunity to present evidence. Only after such a hearing did we enter our order denying defendant's request to vacate the March 21, 1995 order of support.

Finally, in accord with the Superior Court in the case of *Chrzanowski v. Chrzanowski,* 325 Pa. Super. 298, 472 A.2d 1128 (1984), we recognized that defendant acted out of a desire to keep the family together, despite some doubt as to the true paternity of the child. Nonetheless, "we cannot permit [defendant] to victimize the child by making his willingness to support contingent on the state of his relationship with [the child's] mother." *Id.* at 307, 472 A.2d at 1132.

For all the foregoing reasons, we denied Michael A. Zakeosian's request to vacate the order of support dated March 21, 1995.